198 P.2d 256

**STATE v. MARTINEZ.**

No. 5088.

Supreme Court of New Mexico.

Sept. 28, 1948.

Mather M. Eakes, of Farmington, and Robert M. Eakes, of Durango, for appellant.

C. C. McCulloh, Atty. Gen., Robert V. Wollard and William R. Federici, Asst. Attys. Gen., for appellee.

LUJAN, Justice.

The defendant was tried upon a charge of having murdered Beraldo Archuleta and was convicted of voluntary manslaughter and sentenced to a term in the state penitentiary. From this judgment and sentence he has appealed to this court.

It is asserted that the trial court erred in overruling defendant's challenge to the jury panel, because as it is said, "A large number of jurors were excused indiscriminately and without good cause, so that the panel that is now placed upon this defendant is not made up in the order in which they came or based upon legitimate causes." It seems that forty-four jurors qualified for service for the term of court. It became necessary to discharge twenty of these, as the trial jury panel consists of twenty-four qualified persons. The court, upon excuses given satisfactory to it, discharged eighteen of these jurors, leaving twenty-six, and then called the first twenty-four names to constitute the jury for the term.

This is the ordinary procedure in selecting juries. Necessarily the court was required to release twenty of those qualified to act as jurors. Eighteen of these were discharged by the trial court for business reasons, and the panel was complete before the names of the other two were reached.

We said in State v. Sims, 51 N.M. 467, 188 P.2d 177, 179: "The trial court is necessarily invested with a wide discretion in the superintendence of the process of impaneling the jury and in the absence of unusual circumstances we will not disturb its exercise." State v. Burrus, 38 N.M. 462, 35 P.2d 285.

There is nothing in the record to indicate that any member of the jury was biased or prejudiced or that the defendant was not accorded a fair and impartial trial.

We adopted the following rule from 1 Thompson on Trials, Sec. 143 In State v. Rodriguez, 23 N.M. 156, 167 P. 426, 428, L.R.A.1918A, 1016: " 'No party can acquire a vested right to have a particular member of the panel sit upon the trial of his cause until he has been accepted and sworn.

It is enough that it appear that his cause has been tried by an impartial jury. It is no ground of exception that, against his objection, a juror was rejected by the court upon insufficient grounds, unless, through rejecting qualified persons, the necessity of accepting others not qualified has been purposely created.' " There is no merit to this contention.

Dr. Rife, a ballistic expert, or one skilled in the science of ballistics, gave expert testimony on the question of whether the bullet that killed deceased was fired from defendant's gun. It is asserted that the trial court erred in permitting the witness to state as a fact and not as his opinion, that the bullet in question was fired from the defendant's gun. After qualifying as a ballistic expert, he testified as follows:

(Examined by District Attorney):

"Q. Doctor, I hand you State's Exhibit 2 and ask you to state whether you have ever seen that before: A. Yes, sir, this has been in my possession since April 18th, 1947.

"Q. And where did you get it, Dr. Rife? A. I got it from yourself, it was delivered to me in my laboratories in Santa Fe on that date at 11 A.M.

"Q. Was there anything else delivered to you by me at that time? A. Yes, sir.

"Q. Will you kindly state what it was? A. This pistol, a 25 Colt automatic No. 92031; 7 empty cartridge cases marked 'Peters ACP 25 Caliber.' The ACP stands for automatic Colt pistol. One 25 caliber metal jacketed bullet that had been fired and marked and referred to hereafter as the 'evidence bullet.' Two loaded 25 caliber Peters ACP ammunition, which I used for recoveries and comparison purposes.

"Q. I hand you State's Exhibit No. 1, and ask you what that is? A. This is a 25 caliber metal jacketed automatic bullet. This is marked 'evidence' and the same bullet as described a while ago.

"Q. Now, Doctor, I wish you would tell this jury what, if any, experiments you made with the loaded 25 caliber Peters ACP ammunition that was turned over to you. A. The two loaded cartridges were placed in a clip of a Colt automatic pistol, 25 caliber, No. 92031, and were fired into a recovery box of my own design and invention that has been copied I suppose all around the world, with the purpose of comparing the marks not only on the cartridge case but on the bullets as they went through the barrel, with the evidence bullet and evidence empty shells that I received from you on the date mentioned previously. (State's Exhibit 3 marked.)

"Q. I hand you State's Exhibit No. 3, and ask you to state what those are? A.

This box contains the recoveries from the two pieces of loaded ammunition fired through Colt 25 automatic. They are two bullets and two empty cartridge cases both fired in—I have them here. Those are your evidence shells, both fired in Colt Automatic pistol No. 92031.

"Q. Now, did you, Dr. Rife, make any ballistics examination of State's Exhibit No. 1, in connection with State's Exhibit No. 2? A. Yes, sir, I did.

"Q. Now will you please state to the jury the result of that examination? A. As I previously described before the identical ammunition, this Peters 25 caliber ACP was fired through the little gun there. The markings on the bullet, signature left by the barrel of the gun on the bullets were compared with the markings on the evidence bullet, State's Exhibit No. 1, and found to be identical. Both note what we call the class characteristics, that is, the same number of lands and grooves on the bullet, the same direction of the pitch of the rifling and the individual marks left by the lands and the grooves in the rifling of this barrel. Those markings were absolutely identical under the microscope, with the markings left on the bullet, State's Exhibit No. 1. Also the test shells, using the same ammunition, the markings from the breech face of the gun were left on the primer cups. Most of you, I think, know what they are, they are the little primer cups inside the head of the shell. Those compared identically with those left on the primer cups of the evidence empty shells.

\*    \*    \*    \*    \*    \*

"Q. Dr. Rife, can you express an opinion from your experience as a ballistics expert, whether or not State's Exhibit No. 1 was fired from State's Exhibit No. 2, this 25 Colt No. 92031? A. Yes, sir, I can. This is an exact identification and I can prove it with my microscope there to the jury. The marks are not similar, they are absolutely identical, all of the marks that I described, and if I must put it as my opinion, I will say yes. \* \* \*

"Q. I will ask you, from an examination of these two bullets, that is State's Exhibit No. 1—A. Which is here.

"Q. And a test bullet—A. Which is here.

"Q. Whether or not you can state what gun they were fired out of? A. Yes, sir, I can.

"Mr. Mather Eakes: I offer the same objection, if the Court please. I don't mean to be highly technical, that is not my point or purpose, it is my understanding that it is well known in legal circles that an expert, duly qualified, can give his opinion, but he cannot go beyond that \* \* \*

"Court: The objection will be overruled.
* * *

\* \* \* ' \* \* \* '

"Q. I hand you herewith State's Exhibit No. 1, which is the bullet which was extracted, according to the testimony of Dr. Chadwell, from the body of the deceased, and ask you to point out which bullet that is. A. It is the bullet nearest the jury.

"Q. And I will ask you to point out what the other bullet is. A. The other is a test bullet recovered by myself, as I described a while ago, from the recovery box.

"Q. Will you examine those two bullets under the microscope and state whether you can tell what gun they were fired out of? A. I have examined them in many, many hours, spent a good many hours on them. I can look at them again. They were fired from Colt 25 caliber automatic pistol No. 92031.

"Q. Now, I will ask you to demonstrate to the jury—

"Mr. Mather Eakes: I move to strike the answer to that question, in order to keep my objections straight here. The witness cannot testify beyond an opinion statement as to whether the bullets were fired from the same gun or not.

"Court: The same ruling, the objection will be overruled.

"Mr. Mather Eakes: Exception.

"Q. Will you explain to the jury and demonstrate to them, if they wish to, how you reached that conclusion: A. First of all, in comparing bullets we recover bullets through the suspected gun or the evidence gun by firing a bullet into a box that is backed with cotton waste, as a rule, it is boiler plated inside and that balls up the bullets with a little ball of cotton waste so that they are not scratched. The signature, or marks from the barrel and the rifling of guns are especially good and especially permanent on bullets of this particular nature, the automatic bullets especially because they are coated with a metal jacketing that we call gilders metal, or gilding metal, which is an alloy of about 60% copper and 40% zinc or tin. That retains not only the marks of the rifling, the lands and grooves in the gun barrel, but also the individual scratches left by the rifling cutter when the barrel is rifled at the factory. As some of you may know, the barrel is drop forged and then bored. Then when bored to the proper caliber, it is rifled with a series of rifling cutters, two types, a hook and a scrape cutter that are drawn through the barrel with a machine in this fashion, which produces the twist to the rifling. Now, in a Colt, and the Colt people are the only ones who manufacture guns with the rifling pitch to the left. All other American small arms,

Remington, Savage and Smith and Wesson, the rest, the pitch of the bullet is to the right. The Colt people pitch theirs to the left. In other words, it gives the bullet a spin to the left, that is regardless of whether it is an automatic of this type or larger, or a revolver. Now, if the lands and grooves, and by the lands I mean the spaces between the grooves in the rifle barrel, are the same in number on our test bullet as on our evidence bullet, and the number, I say the number of lands and grooves are the same, the pitch of the rifling is the same, the width of the lands and the grooves the proportion between them are the same, that eliminates a tremendous number of guns from our study. To get to the point of positive identification, say we had two Colt 25 automatics, same model, and from almost the same serial number, no two gun barrels have been found alike that will produce the identical signature on bullets fired through them. We look for the individual characteristics in the small marks in the lands and the grooves of these bullets, providing all of the class characteristics are the same. Now, how are these made? As the rifling cutter goes through the barrel of the gun, the edge of the cutter is constantly changing, being steel and brittle little pieces of metal build up in front of the cutter so that you have a continuous change in the cutting surface of the rifler as it goes through the barrel of the gun. Those leave individual distinct marks that are individual and distinct to that one gun alone, and they cannot be produced—reproduced exactly even using the same cutter, because I told you why, because the cutting edge changes and the metal of the barrel and the rifling cutter itself goes up in front of the edge and the rifling cutter is changed. They are not the same in each groove or each land, as a matter of fact, so looking the bullet round and round altogether, and putting these marks of identity together, that is the way we come to our conclusion that a certain bullet was fired from a certain gun and no other.

"Q. Then it is—you will state positively then that that State's Exhibit No. 1, the evidence bullet, was fired out of State's Exhibit No. 2, this gun? A. Yes, sir, I do.

\*   \*   \*   \*   \*   \*

"Q. Now, Dr. Rife, as to the shells, State's Exhibit No. 4, will you kindly state, along the lines that you have just testified to about those bullets, whether or not you can determine what gun those particular shells, being two 25 shells, which were introduced here in evidence as State's Exhibit No. 4.

"Mr. Mather Eakes: I would like to make the same objection, if the Court please, as I made to a similar question before.

"Court: Yes, same ruling, and you are allowed an exception. A. When these guns are manufactured at the factory, of course they are not all assembled until the last thing, the breech face on the frame, I can show it to you, it is where the firing pin comes through, it is that part back here is filed, but when they come along an assembly line they are vised, he runs a file against the breech face, it is impossible for a man, we contend, to file two breech faces that are exactly alike, you just can't do it, passing a file maybe 20 or .25 times more or less over the breech face of this gun that leaves the file marks on the breech face when the cartridge is exploded, the recoil bounces the shell back against the breech face of the gun just as the firing pin goes through to set it off, or just afterwards. It is all part of the same mechanism, the primer caps or cups are very soft metal and they are recoiled back against the breech face of the gun with a tremendous force, and being much softer metal than the shell itself, the file marks on the breech face are left on the primer cups and every single shell that is fired from a given gun shows exactly the same file marks, exactly the same, unless the gun were taken and redressed or reworked by a gunsmith or something like that.

"Q. Now, have you examined all of those empty shells through the microscope? A. Yes, sir, I have.

"Q. From that examination can you state from what you have testified and from your examination from what gun these shells State's Exhibit No. 4 was fired from? A. Yes, sir, I can.

"Q. Will you kindly state?.

"Mr. Mather Eakes: Just a moment, what was the question:

"Mr. Clancy: What gun, if you know, they are fired from?

"Mr. Mather Eakes: I object.

"Court: Objection will be overruled and exception allowed. A. They were both fired, both the evidence shells and the test shells, from Colt 25 Automatic No. 92031."

The witness was never asked for his opinion on the question posed. The defendant's objection to his conclusions stated as facts and not as opinions, were definitely overruled by the court. The witness stated without qualification, in answer to questions (1) that he could identify the gun from which the death bullet was fired; (2) "They (the death bullet and test bullet) were fired from Colt 25 caliber automatic pistol No. 92031" (defendant's gun); (3) "I will state positively that the evidence bullet (death bullet) was fired out of State's Exhibit No. 2, this gun," (defendant's gun); (4) "Both the evidence shells and the test shells were fired from

Colt automatic 25 caliber pistol No. 92031." (Defendant's gun).

■■ Can we say that, while the rules of evidence do not permit experts to testify to the facts sought to be proved, but are confined to expressing their opinions from their experience and tests made, that the jury could not have been misled? We are satisfied that modern science has established that this class of ballistics is almost, if not an exact science; yet those who testify as ballistic experts have varying ability and their testimony should be confined, like that of experts generally, to opinion testimony.

"The tracing of a bullet to the particular weapon from which it was discharged, by identifying the marks on the bullet with the physical features of the weapon, has now become possible by the development of the science of ballistics, aided by the arts of microscopy and photography. * * * The use of such evidence involves two separate inferences. One is based on a general fact of ballistics recently discovered; the other is based on the testimony of the individual witness. The general fact of ballistics is that no two missiles discharged from the same or different firearms bear the same trace-marks. From this fact, when conceded, we can infer that the marks on a particular missile, when examined with suitable methods, indicate the firearm from which it was discharged. This general truth was until recently unknown and disputable; judicial opinion now recognizes it as a conceded fact of which judicial notice may be taken.

"The second inference is based on the assertion of the individual witness that he has indeed used methods suitable to disclose the detailed marks, and that the marks thus disclosed are identical in the missile and the firearms in the particular case. Obviously it is at this inference that one case may differ from another. The witness may not be qualified to use the method; or he may not have used it correctly; or he may not be correct in his assertion that the marks are the same. It is at this point that courts must be on their guard against charlatan witnesses claiming to be qualified. The science itself is so convincing in its revelations that its misuse by a charlatan is dangerous." II Wigmore on Evidence, Sec. 417a.

It may be true that such witnesses as Colonel Goddard, who testified in Evans v. Commonwealth, 230 Ky. 411, 19 S.W.2d 1091, 66 A.L.R. 360, and other reported cases, are so skilled in the science of forensic ballistics that the chance of error is negligible. But the rule is general, and must apply to all witnesses permitted by trial courts to testify as experts or skilled in that science. The belief of a witness that his skill is so transcendent that an error in judgment is impossible, may it-

self be false or a mistake, assuming that the science is exact.

There are cases in which such evidence stated as facts has been approved (People v. Jennings, 252 Ill. 534, 96 N.E. 1077, 43 L. R.A.,N.S., 1206; State v. Kuhl, 42 Nev. 185, 175 P. 190, 3 A.L.R. 1694, both finger print cases) but we are inclined to follow Evans v. Commonwealth, supra, and hold that a witness skilled in the science of forensic ballistics could testify only as to his opinion, although it may be stated as his conclusion from experiments with the gun, bullets and shells in evidence. The witness in the Evans case stated [230 Ky. 411, 19 S.W.2d 1096], "I am convinced as a result of this test that the bullet in evidence was fired through the pistol in evidence." This was held to be an opinion, and not a statement of fact.

In State v. Campbell, 213 Iowa 677, 239 N.W. 715, 724, the same witness Goddard testified, " 'The conclusion I reach as a result of the study of these pictures was to the effect that both of these bullets had passed through the same barrel.' " It was held, "The conviction or conclusion of an expert or skilled witness is, after all, only his belief, his opinion, or best judgment." And see to the same effect, State v. Boccadoro, 105 N.J.L. 352, 144 A. 612, in which the same witness Goddard testified as to his "conviction" that two bullets in evidence had been fired from the

same gun. See also State v. Shawley, 334 Mo. 352, 67 S.W.2d 74; State v. Couch, 341 Mo. 1239, 111 S.W.2d 147; Dobry v. State, 130 Neb. 51, 263 N.W. 681; Ferrell v. Commonwealth, 177 Va. 861, 14 S.E.2d 293. These cases held that one skilled in ballistics could testify only to his opinion resulting from his experiments.

The case of State v. Steffen, 210 Iowa 196, 230 N.W. 536, 538, 78 A.L.R. 748 is not materially different from the present case except that the witness was testifying as a finger print expert. He testified in detail as to the manner and means of indentification of persons by means of their finger prints. He was not asked to express an opinion, but for a fact of identity. The court stated: "we are not disposed to change the rule which has been established in this court for many years to the effect that while an expert may be permitted to express his opinion, or even his belief, he cannot testify to the ultimate fact that must be determined by the jury. Such testimony would invade the province of the jury and determine the very issue which they must decide."

We are not disposed to agree with the Iowa court that this testimony was that of an ultimate fact. It was undoubtedly an evidentiary fact and a link in the chain of facts from which the jury could determine that the defendant was guilty of murder. But the fact itself, it was held, could not be

testified to by an expert witness. Three of the justices of the Iowa court dissented, holding that the witness could testify positively to the fact involved, citing the Kuhl and Jennings cases, supra, as authority.

The trial court erred in permitting the witness to testify to the facts stated.

The defendant was arrested near Aztec, New Mexico, and thereafter signed a statement regarding the killing of the deceased. The statement was in substance that he was present at the dance at which the deceased was killed; that he saw one Ulibarri, a soldier in uniform, fire the shot that killed the deceased. He and others, including Ulibarri, were in an automobile going to his home in Colorado when arrested. He stated that there was a fight at the dance; that he had fired several shots into the ground to keep the crowd off of him as he was trying to leave in his automobile. He denied that he fired the shot that killed deceased. This statement was introduced after the trial court heard testimony regarding whether it was voluntary.

It is contended that the statement was made by defendant in consideration of a promise of one Eddie Mack, an investigator for the district attorney's office, to the effect that Mack would help defendant, and assured him that "it would go much easier" with defendant if he would plead guilty to having murdered the deceased. There is nothing in the testimony to indicate that Eddie Mack promised him any assistance except in case he would plead guilty to the charge of murdering the deceased. The following is the testimony on this point:

"Q. Did you at any time see him alone? (Eddie Mack) A. Yes, I did.

\* \* \* \* \* \*

"Q. Will you state what he said then and what you said: A. Well, he told me that I had killed a guy up in Martinez Town and that the other witnesses had stated that I was the one that killed him, and then he told me that if I plead guilty it would be easier on me, if I plead guilty. Then I told him I couldn't plead guilty because I wasn't the one that had killed the guy. Then he told me—

"Q. Did he say he would do anything for you? A. If I plead guilty he said he can help me in anything that he could, if I plead guilty, and if I didn't plead guilty, if they found me guilty it was going to be worse for me, they would send me to the penitentiary. That's what he told me, and the best thing for me was to plead guilty.

"Q. What did you tell him? A. I told him I couldn't plead guilty because I wasn't the one that had killed the guy.

"Q. Did he ever tell you that anything you said would be used against you? A. He didn't told me that.

\* \* \* \* \* \*

"Q. Did any one tell you that? A. Well, Mr. Palmer told me that.

"Q. Bud Palmer told you? A. Yes, sir."

On cross-examination he testified:

"Q. Were you forced to sign that statement? A. No, sir I wasn't.

"Q. You signed it voluntarily did you not? A. Yes, I did.

"Q. Did any one threaten you up here before that statement was taken, or during the time it was taken? A. No, sir."

To all appearances it was a free and voluntary statement, without hope of reward, and made without force or threats of violence.

It was not error to admit it in evidence.

There is no merit in the contention that the testimony of Dr. Chadwell was inadmissible. He examined the body of the deceased and testified that in his opinion the deceased died from the effects of a gun shot wound that he found on the body.

Other points are made, but in view of our conclusion it is unnecessary to determine them.

The judgment of the district court is reversed and cause remanded to the district court with instructions to set aside its judgment and grant defendant a new trial.

It is so ordered.

BRICE, C. J., and SADLER, McGHEE and COMPTON, JJ., concur.