665 P.2d 280

**STATE of New Mexico,
Plaintiff-Appellee,**

v.

**Lisa Jeanette SEGOTTA, a/k/a Lisa J.
Baca, Defendant-Appellant.**

**No. 5685.**

Court of Appeals of New Mexico.

May 5, 1983.

Paul G. Bardacke, Atty. Gen., Carol Vigil, Asst. Atty. Gen., Santa Fe, for plaintiff-appellee.

Scott McCarty, Albuquerque, for defendant-appellant.

## OPINION

DONNELLY, Judge.

Defendant Lisa Segotta appeals her convictions for second degree murder as an accessory in the death of her husband, John Segotta, contrary to § 30–2–1(B), N.M.S.A. 1978 (1982 Cum.Supp.), and solicitation to commit murder contrary to §§ 30–28–3 and 30–2–1(A), N.M.S.A.1978 (1982 Cum.Supp.). Defendant was acquitted of charges of first degree murder and conspiracy. A co-defendant, David Mead (Mead), was convicted of second degree murder and pursues a separate appeal.

 We discuss (1) the denial of defendant's severance motion; (2) admission of defendant's statements; and (3) answer other issues summarily. Additional claims listed in the docketing statement and not briefed are deemed abandoned. *State v. Edwards,* 97 N.M. 141, 637 P.2d 572 (Ct. App.), *cert. denied,* 97 N.M. 621, 642 P.2d 607 (1981). We affirm.

*Facts*

On the evening of March 30, 1981, defendant and her husband drove to his office at an engineering firm in Albuquerque at her request, so that she could type a paper for a class at the University of New Mexico. Defendant and her husband stayed at the office approximately 30 minutes and then left to return home. As they exited the building, defendant testified that a man grabbed her husband by the neck and she saw another man in the shadows. Defendant ran to a nearby Circle K store.

At the store, defendant related that "they're attacking my husband." A store clerk phoned the police. Defendant, with a customer who had just arrived at the store and three others, ran to the location where defendant stated her husband had been attacked. When defendant and the others arrived at the scene, they found two men lying on the ground. Defendant's husband was dead, having suffered over forty stab wounds. Nearby, Mead, wearing a stocking around his neck, was found gravely wounded and bleeding profusely. Paramedics were summoned. John Brown, a paramedic, testified that upon his arrival Mead was still thrusting a large knife about and he had to wait until police took it away from him before he could render medical assistance. Mead had received a massive wound to his left leg; subsequently the leg was amputated.

According to the testimony of witnesses, when defendant returned to the scene, she ran to the first individual on the ground and said "John, John," and then "Oh, no, that's David." A police investigator, Robert Romero, found a blue Datsun automobile parked nearby with a door open and keys in the ignition. A vehicle registration check revealed that the car was owned by a roommate of Mead. Defendant's fingerprint was found on a wrapper for women's hosiery in the Datsun automobile located at the scene of the crime.

Officer A.J. Romero testified that when he first arrived at the scene defendant told him that two or possibly three people had attacked her husband. After Romero

checked the ownership of the Datsun car found nearby, he asked defendant whether she knew the owner of the car; she responded that he was David Mead's roommate and that she had had an affair with Mead. Romero testified that he asked defendant whether her husband had any enemies that she knew of and that she stated that he had none. He said that she told him that she and her husband had previously experienced marital trouble and that she had planned to get a divorce but that they had reconciled. Police officer Tammy LaDue, who arrived later, also spoke with defendant at the scene and recorded the interview on tape.

At trial, defendant testified that while she and her husband were separated, she had met Mead and they had been sexually intimate. Thereafter, defendant and her husband reconciled and resumed living together; however, defendant continued to see Mead. She admitted at trial that earlier on the day of her husband's death she had visited with Mead at lunch.

Mario Guggino, a manager of a K–Mart Department Store, identified both defendant and Mead and testified that he had sold a large sheath knife to them earlier on the day of the killing. He said that defendant paid for the knife with a check. He also identified a knife found at the scene of the stabbing as the same knife he had sold to defendant and Mead.

Mead testified that defendant had told him that her husband had mistreated and assaulted her during the weekend preceding the killing and that she had requested his help. He stated that defendant had suggested that Mead scare her husband so he would leave her alone. He testified that on the day of the killing he and defendant had discussed some sort of confrontation with her husband. Mead said that as a result of this discussion he borrowed a Datsun automobile from his roommate, planning to confront and frighten defendant's husband. He testified that it had been defendant's idea that he wear the stocking over his head during the confrontation, that defendant had told him she would ask her husband to

take her to his office after work so she could type a class paper and Mead could confront her husband there. Mead stated that defendant had told him that she and her husband would leave the office around 10:00 p.m.

Mead further testified that after purchasing the knife, defendant drove him to his home where he strapped it to his leg. He said that he then went to a bar and waited there until approximately 9:30 p.m. He drove to the office of Boyle Engineering, parked the car, left the keys in the ignition, and placed the nylon stocking over his head. When defendant and her husband came out of the building, Mead confronted decedent and a fight ensued. Mead stated that defendant's husband grabbed him, that he felt a sharp pain in his leg and saw a knife in John Segotta's hand. He testified that he then grabbed the knife and stabbed decedent several times but could not recall anything thereafter.

Detective Robert Romero interviewed Mead after he was hospitalized. Mead then said that he and the defendant had planned for several weeks to scare John Segotta or beat him up. Mead also told Romero that he was a knife expert and had killed John Segotta after decedent had first stabbed him in the leg. Photographic evidence of the crime scene and the victim introduced at trial indicated that decedent had been stabbed repeatedly and had suffered. at least ten separate wounds to his chest and upper torso resulting in massive wounds and profuse bleeding.

Dr. Gary Ritchey, a psychology professor at the University of New Mexico, testified that defendant was enrolled as a student in his class. He testified that the class paper defendant had typed on the evening of her husband's death was taken word-for-word from a textbook used in the class and was unrelated to any class assignment.

At the time of John Segotta's death, defendant was a part-time employee at Alphagraphics in Albuquerque. Another worker in the building employed by a different company, Maurice Landavazo, testified that approximately a week prior to the

time decedent was killed, defendant approached him and asked him whether he knew of a "hit man" near where he lived. The following day, defendant again asked him about locating a "hit man" and explained that a friend of hers needed one. Landavazo testified that defendant told him it would be an easy hit and that the intended victim frequently walked to work through an alley-way or in a large open area. Landavazo testified that defendant told him that her friend would pay $500.00 for the hit and $50.00 to defendant for locating the "hit man." Subsequent testimony revealed that defendant's husband frequently walked to work, customarily following a route which took him through an alley and an open field.

*Issues Answered Summarily*

■ (A) Defendant was charged with accomplice liability for first degree murder and convicted of the lesser included offense of second degree murder. Defendant contends that the trial court erred in submitting the charge of second degree murder to the jury because the evidence could only sustain a verdict of either first degree murder or acquittal, not a lesser degree of homicide.

This claim is without merit. Defendant relies upon *Smith v. State,* 89 N.M. 770, 558 P.2d 39 (1976), for the proposition that a conviction predicated upon a lesser degree of homicide is improper where the evidence only supports a conviction for the higher charge of murder.

Defendant's case is readily distinguishable from the facts in *Smith.* The evidence presented in the instant case is sufficient to support defendant's conviction as an accessory upon every element of the lesser included offense of second degree murder. *State v. Nance,* 77 N.M. 39, 419 P.2d 242 (1966), *cert. denied,* 386 U.S. 1039, 87 S.Ct. 1495, 18 L.Ed.2d 605 (1967); *State v. Roque,* 91 N.M. 7, 569 P.2d 417 (Ct.App.), *cert. denied,* 91 N.M. 4, 569 P.2d 414 (1977). The trial court instructed the jury, *inter alia,* as to second degree murder, N.M.Crim.U.J.I. 2.10, N.M.S.A. 1978 (1982 Repl.Pamph.), and aiding and abetting, N.M.Crim.U.J.I. 28.30,

N.M.S.A. 1978 (1982 Repl.Pamph.). In reviewing a challenge as to the sufficiency of the evidence to support a conviction, the standard of review on appeal is whether the evidence, viewed in a light most favorable to the State, convinces the reviewing court that a rational fact finder could have found the defendant guilty beyond a reasonable doubt. *State v. Gonzales,* 95 N.M. 636, 624 P.2d 1033 (Ct.App.1981). The evidence warranted the giving of the second degree murder instruction and supports the verdict of the jury.

■ (B) Defendant contends the trial court erred in denying her motion for directed verdict as to the charge of solicitation and that the State failed to prove the charge by substantial evidence. As set out in § 30–28–3(A), *supra,* "a person is guilty of criminal solicitation if, with the intent that another person engage in conduct constituting a felony, he solicits, commands, requests, induces, employs or otherwise attempts to promote or facilitate another person to engage in conduct constituting a felony." The offense of solicitation is complete when the solicitation is made. The object of the statute is not only prevention of the harm that would result if the inducement were successful, but also protection of citizens from exposure to inducements to commit or join in the commission of felonies. *State v. Casteneda,* 97 N.M. 670, 642 P.2d 1129 (Ct.App.1982).

■ *State v. Gilbert,* 98 N.M. 77, 644 P.2d 1066 (Ct.App.1982), held that "the crime of solicitation does not require agreement; there need be only unilateral acts on the part of the accused of inducement or request for another to commit a felony." Reviewing the evidence recited above, the record supports the trial court's submission of the charge to the jury and supports the verdict finding defendant guilty of solicitation beyond a reasonable doubt. *State v. Davis,* 97 N.M. 745, 643 P.2d 614 (Ct.App. 1982); *State v. Gonzales, supra.*

■ (C) Defendant claims the jury selection process and the discharge of several prospective jurors violated her rights to due

process and fair trial. The initial panel of prospective jurors was composed of individuals whose jury service had been postponed during the previous few months. During jury *voir dire,* it was discovered that some of the panel members had not been sworn. Initial qualification of prospective jurors as required by § 38–5–11, N.M.S.A.1978, had been assigned by the trial court to the district court clerk. When it became apparent that a number of the prospective jurors had never been sworn or properly qualified, the State moved to dismiss the entire panel. The trial court offered to administer the oath to the unsworn prospective jurors *nunc pro tunc* but defendant objected. The court then discharged the panel and a second panel was called; from that group, jurors were ultimately selected to serve in defendant's case.

Defendant contends that the first panel was comprised of younger people, more students, and a greater ratio of men to women. The record fails to show that the jury selected to try defendant's case was either improperly impanelled or composed of ineligible jurors. While it is the duty of the trial court to see that defendant is accorded a fair, impartial and properly qualified jury, *State v. Gallegos,* 88 N.M. 487, 542 P.2d 832 (Ct.App.), *cert. denied,* 89 N.M. 6, 546 P.2d 71 (1975); *State v. Verdugo,* 78 N.M. 762, 438 P.2d 172 (Ct.App.1968), an accused has no vested right to have any particular juror serve on the trial of his case until the jury has been accepted and sworn. *State v. Smith,* 76 N.M. 477, 416 P.2d 146 (1966); *State v. Martinez,* 52 N.M. 343, 198 P.2d 256 (1948). Unless the record affirmatively shows that defendant was not tried by a fair and impartial jury, there is no error. *State v. Thomas,* 133 Ariz. 533, 652 P.2d 1380 (1982). There is no evidence that defendant's case was heard by other than an impartial jury.

### Failure to Sever Trials

Defendant contends that the trial court erred in failing to order her trial severed from that of Mead and refusing to sever Count III, criminal solicitation, from the other charges filed against her.

(A) Defendant asserts that the joint prosecution of her case with that of Mead deprived her of the right to a fair trial and permitted the introduction of prejudicial evidence which would have been improper in her separate trial. Defendant further argues that she was prejudiced by the court's failure to grant a severance of her trial from the co-defendant because of the mutually inconsistent and antagonistic defenses inherent in the defendants' presentations. Defendant argues, as examples, Mead's testimony that she had manipulated him into attacking her husband and that she had been feigning grief over her husband's death. She further contends that Mead sought throughout the trial to train the focus of the jury on her culpability for the killing and away from himself.

N.M.R.Crim.P. 11, N.M.S.A.1978 (1980 Repl.Pamph.), expressly requires joinder of defendants at the charging stage where both are charged with a common conspiracy:

Two or more defendants shall initially be joined in the same complaint, indictment or information:

(a) when each of the defendants is charged with accountability for each offense included;

(b) when all of the defendants are charged with conspiracy and some of the defendants are also charged with one or more offenses alleged to be in furtherance of the conspiracy; or

(c) when, even if conspiracy is not charged and not all of the defendants are charged in each count, the several offenses charged: (i) were part of a common scheme or plan or (ii) were so closely connected in respect to time, place, and occasion that it would be difficult to separate proof of one charge from proof of others.

N.M.R.Crim.P. 34, N.M.S.A.1978 (1980 Repl.Pamph.), provides that, if it appears that a defendant is prejudiced by joinder of offenses or defendants in any indictment, "the court may order separate trials of offenses, grant a severance of defendants, or provide whatever other relief justice re-

quires." This rule was amended in 1980 to delete a proviso allowing a separate trial as a matter of right and instead to place the determination of whether a trial severance should be granted within the trial court's sound discretion. *See State v. Volkman,* 86 N.M. 529, 525 P.2d 889 (Ct.App.1974).

During the trial, both co-defendants testified. Further, each defendant extensively cross-examined the other. Mead's theory of the case was self-defense. He testified that defendant had not informed him that she had reconciled with her husband, that he and defendant together had discussed decedent's mistreatment of defendant, and that defendant had sought his assistance in getting her husband to leave her alone. Mead also testified that he had meant only to confront the victim, because Mead believed the victim had beaten and raped defendant. Mead's defense was that he had meant merely to scare decedent and that during the "confrontation" decedent stabbed him and thereafter Mead used his knife in self-defense. Mead requested and obtained a jury instruction on self-defense.

Defendant Segotta denied that she had had anything to do with the killing of her husband. Her testimony was that Mead had acted alone because he was infatuated with her, that he had refused to accept the fact that she had reconciled with her husband, and that she had wanted to terminate her relationship with Mead. Defendant contends that, by reason of the joinder of trials, she had to defend herself against the State's contention that she had murdered for lust and profit, Mead's defense that he merely had intended to scare her husband and the State's allegation that she had sought to hire a "hit man" to kill her husband.

Defendant admitted that on the day of her husband's death she had eaten lunch with Mead, had purchased a pair of stockings at K-Mart, and had loaned Mead the money to buy a knife. Defendant admitted having had an affair with Mead, insisting, however, that it had ended before her husband's death. Further, she denied that she had ever told Mead that her husband had raped or beaten her.

Essentially all of the evidence complained of by defendant and elicited by Mead was either also presented by the prosecution or would have been admissible against her at a separate trial. Defendant's denial that she had had knowledge that Mead would confront her husband on the night of the killing or that she had requested Mead's assistance against her husband was countered by the State's evidence linking her with Mead earlier that same day: her purchase of the knife with Mead, her fingerprint found on the package of women's stockings, and her earlier inquiries seeking a "hit man." A review of the record indicates there was sufficient evidence to submit to the jury the issues of first and second degree murder, solicitation and conspiracy.

When reviewing an attack upon the trial court's denial of a motion for severance, the appellate issue is whether there was an abuse of discretion resulting in prejudice to the defendant. *State v. Robinson,* 93 N.M. 340, 600 P.2d 286 (Ct.App.1979); *State v. Schifani,* 92 N.M. 127, 584 P.2d 174 (Ct.App.), *cert. denied,* 92 N.M. 180, 585 P.2d 324 (1978); *State v. Baca,* 85 N.M. 55, 508 P.2d 1352 (Ct.App.1973). Where a defendant is charged as an aider and abettor or as an accessory, he may be prosecuted, tried and punished as a principal. *State v. Nance, supra; State v. Ochoa,* 41 N.M. 589, 72 P.2d 609 (1937); *see State v. Johnston,* 98 N.M. 92, 645 P.2d 448 (Ct.App.), *cert. denied,* 98 N.M. 336, 648 P.2d 794 (1982).

Defendant also asserts that she was prejudiced by the trial court's refusal to order a severance in her trial from Mead's because of the existence of conflicting defenses asserted by each of the two defendants. A similar argument was advanced in *United States v. Haldeman,* 559 F.2d 31 (D.C.Cir. 1976), *cert. denied,* 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977). In *Haldeman,* the court held:

While there are situations in which inconsistent defenses may support a motion for severance, the doctrine is a limited one. As set forth in *Rhone v. United*

States, 125 U.S.App.D.C. 47, 48, 365 F.2d 980, 981 (1966), the governing standard requires the moving defendant to show that "the defendants present conflicting and irreconcilable defenses and there is a danger that the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty." Application of this standard, which is for the District Court in the first instance, and reviewable here only for abuse of discretion, requires that the accounts of co-defendants be not merely divergent from one another but indeed "so contradictory as to raise an appreciable danger that the jury would convict solely on the basis of the inconsistency.". To warrant a severance, in short, the accounts of co-defendants must be "on a collision course." *United States v. Bolden,* 169 U.S.App. D.C. 60, 69, 514 F.2d 1301, 1310 (1975).

The general rule is that persons jointly indicted should be jointly tried. N.M.R.Crim.P. 11, *supra; People v. Miner,* 46 Ill.App.3d 273, 360 N.E.2d 1141 (1977); *see State v. Johnston, supra.* There is no abuse of discretion in a court's refusal to sever counts if there is substantial evidence to support each of the convictions, all of the evidence admitted is relevant to each of the charges being tried, and the jury follows the evidence and applies it to each count. *State v. Schifani, supra.*

To obtain a severance on the grounds of conflicting defenses between co-defendants, it must be demonstrated that the conflict is so prejudicial that the defenses are irreconcilable and the jury will unjustifiably infer that the conflict alone demonstrates the guilt of both. *State v. Grisby,* 97 Wash.2d 493, 647 P.2d 6 (1982); *United States v. Becker,* 585 F.2d 703 (4th Cir. 1978), *cert. denied,* 439 U.S. 1080, 99 S.Ct. 862, 59 L.Ed.2d 50 (1979). Separate trials are required only when the defenses of the defendants are so antagonistic that a fair trial can be assured only by a severance and defendants are deprived of the opportunity to present effective defenses. *State v. Andrada,* 82 N.M. 543, 484 P.2d 763 (Ct.App.), *cert. denied,* 82 N.M. 534, 484 P.2d 754

(1971); *State v. Johnston, supra.* The mere fact that one defendant seeks to escape conviction by placing guilt upon a co-defendant, however, is not sufficient grounds for a severance. *United States v. Brady,* 579 F.2d 1121 (9th Cir.), *cert. denied,* 439 U.S. 1074, 99 S.Ct. 849, 59 L.Ed.2d 41 (1978); *United States v. McPartlin,* 595 F.2d 1321 (7th Cir.), *cert. denied,* 444 U.S. 833, 100 S.Ct. 65, 62 L.Ed.2d 43 (1979).

The State presented evidence bearing upon the charges of solicitation and accessory to second degree murder against defendant, consisting of proof of her relationship with Mead, defendant's admissions, Landavazo's testimony, and evidence by the manager of K-Mart. This evidence would also have been admissible against defendant at a separate trial.

(B) Defendant also argues under this point that she was prejudiced by the failure of the trial court to sever and grant her a separate trial on the charge of criminal solicitation, apart from the other charges against her. She argues that the evidence introduced on the charge of solicitation as to her search for a "hit man" for "a friend" prejudiced her credibility and defenses to the other charges. This argument ignores the fact that the testimony of Landavazo would have been properly admitted against her at a separate trial on the charges of murder and conspiracy, to show motive.

Evidence of defendant's efforts to locate a "hit man" was properly admitted both as proof of the charge of solicitation alleged in Count III and to establish defendant's motive to commit murder. Other evidence presented at trial showed that defendant filed a claim to collect the life insurance proceeds for her husband's death. Proof of motive is proper to establish defendant's culpability as to the charge against her. *State v. McCallum,* 87 N.M. 459, 535 P.2d 1085 (Ct.App.), *cert. denied,* 87 N.M. 457, 535 P.2d 1083 (1975). Motive is defined as a circumstance tending to establish the requisite *mens rea* for a criminal act; it is the inducement which impels or

leads the mind to indulge in a criminal act. *People v. Elkhatib,* 632 P.2d 275 (Colo.1981); *State v. Tharp,* 96 Wash.2d 591, 637 P.2d 961 (1981). Extrinsic evidence bearing on the motive of a witness to testify falsely is generally admissible in the trial of a criminal proceeding. N.M.R.Evid. 404(b), N.M.S. A.1978. Moreover, a witness may be cross-examined on any matter relevant to any issue in the case, including his motive. *State v. Lovato,* 91 N.M. 712, 580 P.2d 138 (Ct.App.), *cert. denied,* 91 N.M. 751, 580 P.2d 972 (1978); *United States v. Lester,* 248 F.2d 329 (2d Cir.1957).

Examination of the record does not reveal any abuse of the trial court's discretion in denying defendant's motion for severance.

*Admission of Defendant's Statements*

■ On March 30, 1981, immediately after the arrival of police officers at the scene of the killing, Officer Tammy LaDue tape-recorded a statement by defendant. Later the same evening, Detectives Kline and Romero prepared a typewritten statement signed by defendant concerning the events surrounding the death of her husband. Both statements were obtained by police prior to apprising defendant of her rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974 (1966). Defendant contends that, though she was not placed under arrest when the statements were given, the statements were involuntary and were admitted into evidence contrary to the exclusionary rule articulated in *Miranda.* In advancing this argument, defendant has failed to set forth any specific citations for the facts relied upon in argument, contrary to the requirements of N.M.R.Crim.App. 501(a)(3) and (4), N.M.S.A.1978. Defendant's brief-in-chief makes no reference to whether she objected to the introduction of her statements and, if so, the nature of any objections stated. In order to address the merits of defendant's appeal, we consider this argument, despite counsel's violation of Rule 501(a)(3) and (4), *supra. See State v. Lovato,* 94 N.M. 780, 617 P.2d 169 (1980).

Defendant's pretrial motion to suppress both her taped statement and the typewritten statement was denied by the trial court. At trial, the taped statement was introduced through the testimony of Officer LaDue and played for the jury. Defendant objected to the testimony of LaDue about the contents of the statement, arguing that the recording was the best evidence. Defendant also renewed her pretrial suppression motion that the statement was taken in violation of the *Miranda* requirements. The trial court admitted the taped statement into evidence but sustained defendant's best evidence objection.

Thereafter, during cross-examination of defendant by the state, the prosecution tendered into evidence the typewritten statement. Both defendant and Mead objected. Defendant argued that the statement was hearsay. The trial court overruled the objections and held that the statement was admissible for purposes of impeachment as a prior inconsistent statement. *See State v. Trujillo,* 93 N.M. 728, 605 P.2d 236 (Ct.App. 1979), *aff'd.* 93 N.M. 724, 605 P.2d 232 (1979). The court offered to give a limiting instruction under N.M.U.J.I. Crim. 40.34, N.M.S.A.1978. Defendant objected, however, to the giving of any limiting instruction on the basis that the statement did not contain any admissions to any charge contained in the indictment.

■ The advice of rights required by *Miranda* does not apply to general, on-the-scene questioning of citizens. In *Beckwith v. United States,* 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976), the court stated that the *Miranda* court premised its warnings requirement upon the "custodial aspects" and coercion surrounding an interrogation by police and not upon the subject matter of the interview. *See also Oregon v. Mathiason,* 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977).

■ Defendant was not arrested until 2:00 p.m., April 4, 1981, five days after the death of her husband. The *Miranda* safeguards were intended to apply when a suspect is under arrest or detained in a custodial situation. Statements made out-

side a custodial atmosphere or voluntarily given are generally not subject to suppression. *State v. Edwards,* 97 N.M. 141, 637 P.2d 572 (Ct.App.), *cert. denied,* 97 N.M. 621, 642 P.2d 607 (1981); *State v. Montano,* 95 N.M. 233, 620 P.2d 887 (Ct.App.1980). An appellate court will not overturn a trial court's ruling upon a motion to suppress, so long as there is substantial evidence to support its ruling. *State v. Harge,* 94 N.M. 11, 606 P.2d 1105 (Ct.App.1979).

Denial of defendant's motion to suppress the two statements was not error.

Defendant's convictions are affirmed. The altered portion of defendant's sentences are subject to the ruling of this court in *State v. Mead,* 100 N.M. 27, 665 P.2d 289 (Ct.App.1983), upon application to the trial court pursuant to N.M.R.Crim.P. 57.1, N.M.S.A.1978 (1980 Repl.Pamph.).

IT IS SO ORDERED.

WALTERS, C.J., and BIVINS, J., concur.