**William F. MILLER, Appellant,**

v.

**STATE of Alaska, Appellee.**

**Dwaine W. CHAMBERS, Appellant,**

v.

**STATE of Alaska, Appellee.**

Nos. A–2179, A–2182.

Court of Appeals of Alaska.

Aug. 18, 1989.

---

1. Gregory earned $38,560 in 1986.

2. *See also Rhodes v. Rhodes*, 754 P.2d 1333, 1335–36 (Alaska 1988).

Sen K. Tan, Asst. Public Defender, and Dana Fabe, Public Defender, Anchorage, for appellant Miller.

William F. Dewey, Asst. Public Advocate, and Brant McGee, Public Advocate, Anchorage, for appellant Chambers.

John A. Scukanec, Asst. Atty. Gen., Office of Special Prosecutions and Appeals, Anchorage, and Grace Berg Schaible, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and SINGLETON, JJ.

BRYNER, Chief Judge.

Dwaine W. Chambers and William F. Miller were convicted of first-degree murder following a joint trial by jury. Chambers and Miller were also convicted of various related counts of burglary, robbery, and assault. Superior Court Judge S.J. Buckalew, Jr., sentenced Chambers to a composite term of 126 years and Miller to a composite term of ninety-nine years. Chambers and Miller appeal their convictions, arguing that the trial court erred in failing to grant severance, in improperly limiting cross-examination, and in admitting photographs of the victim's wounds. They also appeal their sentences as excessive. We affirm.

The charges against Chambers and Miller arose from incidents that occurred at two locations in Anchorage during the ear-

ly morning hours of January 17, 1986. After drinking in several bars, Chambers and Miller went to visit an acquaintance, Edna Daniels, at her trailer. While there, they assaulted and robbed Daniels and the three other occupants of the trailer.

Chambers and Miller then walked to a rooming house a few blocks away. They entered the house and took two large butcher knives from the kitchen. Armed with the knives, they broke into one of the rooms and murdered its occupant, Martin Valentine, stabbing him twenty times. They then broke down the door of another room and assaulted and robbed another occupant, Frances McKee. Chambers and Miller were apprehended and arrested by the police as they ran out the back door.

Chambers and Miller both moved for severance prior to trial, on the ground that a joint trial would limit their ability to present evidence. Chambers asserted that in order to establish that Miller had been the aggressor in the murder, he would offer evidence that Miller had behaved aggressively at Daniels' trailer and at various bars earlier that evening. Miller, on the other hand, claimed that he intended to introduce statements made by Chambers to the police that inculpated Chambers and exculpated Miller. The motions for severance were denied.

Neither Chambers nor Miller testified at trial. Chambers called a single witness, who testified about Chambers' drinking habits; Miller did not call any witnesses. In closing argument, both defense attorneys claimed that the evidence showed that only one person had stabbed Valentine, and each argued that the other defendant had committed the murder. In addition, both argued that their clients were so intoxicated that they were unable to form the specific intent to kill.

On appeal, Chambers and Miller first contend that the trial court erred in denying their motions for severance. Both argue that they were entitled to severance in light of the antagonistic and irreconcilable nature of their defenses, in which each accused the other of acting alone in murdering Valentine.[1] In addition, each argues that, as a result of the trial court's failure to grant a severance, prejudicial evidence was admitted that would have been inadmissible in a separate trial.

Alaska Rule of Criminal Procedure 14 provides:

If it appears that a defendant or the state is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants, or provide whatever other relief justice requires....

■ Although antagonistic defenses do not ordinarily require severance, severance should be granted when the defenses are actually irreconcilable. *Abdulbaqui v. State*, 728 P.2d 1211, 1219 (Alaska App. 1986). Defenses are irreconcilable when they are "mutually exclusive to the extent that one must be disbelieved if the other is to be believed...." *Id.* However, the fact that one defendant attempts to blame the other is generally not sufficient to warrant severance. *Middleton v. State*, 577 P.2d 1050, 1053 (Alaska 1978). *See also United States v. Haldeman*, 559 F.2d 31, 71 (D.C. Cir.1976).

Different jurisdictions have expressed the test for when defenses are mutually exclusive and therefore irreconcilable in different ways. In many jurisdictions, defenses are treated as irreconcilable and severance is required "if the jury, in order to believe the core of testimony offered on behalf of [one] defendant, must necessarily disbelieve the testimony offered on behalf

---

**1.** The state argues that Chambers and Miller failed to preserve this claim for appeal because they did not specifically move for severance on the ground of antagonistic defenses. However, the specific grounds for severance raised below were closely related to the broader issue of antagonistic defenses that Chambers and Miller assert on appeal. In the course of argument on the more specific severance issues raised below, all parties extensively discussed the antagonistic nature of the defenses. Having reviewed the record, we conclude that the issue was at least minimally preserved.

of his codefendant." *United States v. Berkowitz,* 662 F.2d 1127, 1134 (5th Cir. Unit B 1981). *See also United States v. Carter,* 760 F.2d 1568, 1575 (11th Cir.1985); *State v. Cruz,* 137 Ariz. 541, 672 P.2d 470, 473 (1983); *State v. Sauls,* 356 N.W.2d 516, 519 (Iowa 1984). In other jurisdictions, defenses are found irreconcilable when the conflict between competing defenses is so great that it gives rise to "a danger that the jury will unjustifiably infer that this conflict alone demonstrates that both [defendants] are guilty." *Rhone v. United States,* 365 F.2d 980, 981 (D.C.Cir.1966). *See also United States v. Madison,* 689 F.2d 1300, 1306 (7th Cir.1982); *State v. Segotta,* 100 N.M. 18, 665 P.2d 280, 287 (App.), *rev'd on other grounds,* 100 N.M. 498, 672 P.2d 1129 (N.M.1983); *State v. Clarke,* 448 A.2d 1208, 1209 (R.I.1982).

■ Regardless of which formulation is applied in the present case, Chambers' and Miller's claim that they were entitled to severance is not persuasive. Neither Chambers nor Miller testified or presented any affirmative evidence against his codefendant. Thus, neither could be said to have been the "government's best witness" against the other, and the jury was not forced to disbelieve the "core of testimony" presented on behalf of either defendant. *Berkowitz,* 662 F.2d at 1134. Moreover, this was not a case in which evidence established that the offense was committed by only one person. To the contrary, the prosecution presented compelling evidence indicating that Chambers and Miller both actively participated in the murder. Thus, it seems unlikely that the jury would have viewed this as a case in which the "conflict alone demonstrate[d] that both defendants [were] guilty." *Rhone,* 365 F.2d at 981. We conclude that, under the specific circumstances of the present case, the trial court did not abuse its discretion in declining to find that severance was required based on the antagonistic nature of the defenses. *Middleton v. State,* 577 P.2d at 1053; *Abdulbaqui v. State,* 728 P.2d at 1219.

■ Chambers separately claims that severance should have been granted because prejudicial evidence was admitted on Miller's behalf that would not have been admissible against Chambers in a separate trial.

After being placed under arrest, Chambers made an incriminating statement that tended to exculpate Miller. Prior to trial, the prosecutor indicated that, to avoid possible *Bruton* [2] problems, the state did not intend to use the statement against Chambers. Miller, however, sought to have the statement admitted, because it was favorable to himself. After Miller indicated his desire to have Chambers' statement admitted, the state altered its original position and elected to introduce the statement as part of its case-in-chief.

Chambers now argues that the statement was inadmissible hearsay. However, as to Chambers, the statement was properly introduced by the state as an admission by a party opponent. A.R.E. 801(d)(2); *Frink v. State,* 597 P.2d 154, 162 & n. 9 (Alaska 1979). Because Chambers' statement would have been admissible at a separate trial, its use against him in the joint trial did not require severance.

■ Miller has also separately claimed that he was entitled to a severance because prejudicial evidence was admitted at trial that would have been inadmissible had he been tried alone. Prior to his trial for the murder and related offenses that occurred at the rooming house, Miller pled no contest to robbery and burglary charges that occurred earlier the same night at the Daniels' trailer. Chambers, however, maintained his not guilty plea as to all charges; consequently, evidence relating to the offenses at the Daniels' trailer was introduced against him at trial. Miller claims that, because he had already pled no contest to the charges arising from the Daniels' trailer incident, evidence concerning that incident could not have been admitted against him had his case been severed from Chambers'.

---

**2.** *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

We disagree. The events at the trailer, which occurred less than an hour before the Valentine murder, were directly relevant to establish Miller's state of mind at the time of the murder, to show that he was acting in concert with Chambers, and to prove his capacity to form the specific intent required for murder. The trial court could properly conclude that, as to Miller, the probative value of this evidence outweighed its potential for prejudice. *See Lerchenstein v. State*, 697 P.2d 312, 315–16 (Alaska App.1985), *aff'd*, 726 P.2d 546 (Alaska 1986). Since the evidence would have been admissible against Miller at a separate trial, its admission at the first trial did not require severance.

■ Chambers and Miller next argue that the trial court erred by refusing to permit them to cross-examine the police officers who arrested them about whether it was necessary to obtain a search warrant to test their blood alcohol level. Approximately five hours after arresting Chambers and Miller, the police applied for a search warrant to take blood swabs, fingernail scrapings, and blood samples for alcohol testing. The blood samples were not actually obtained until approximately eight hours after the arrest. Chambers' blood alcohol level was .099 percent, and Miller's was .028 percent.

At trial, the state's expert, Dr. Propst, testified that Chambers' estimated blood alcohol level at the time of the murder was .219 percent and that Miller's was .148 percent. Through cross-examination, Chambers and Miller attempted to show that the police procrastinated in obtaining the blood samples because they were aware that blood alcohol testing might produce evidence to support a defense claim of diminished capacity. To establish this claim, they sought to ask the investigating officers whether a search warrant was required to obtain the blood samples. The trial court ruled, as a matter of law, that search warrants were necessary and that the proposed cross-examination was therefore impermissible. On appeal, Chambers and Miller argue that the trial court was mistaken in concluding that search warrants were necessary, and therefore erred in limiting cross-examination.

The ultimate question of whether a search warrant was required to obtain blood samples from Chambers and Miller involves a difficult issue that has not been clearly resolved in Alaska. Regardless of whether a warrant was required as a matter of law, however, the trial court did not err in its ruling in the present case. The precise question that Chambers and Miller sought to ask—whether a warrant was actually required—would effectively have called upon police officers to express an opinion on a difficult issue of law. The resolution of this issue is plainly beyond the competence of a lay witness.

Moreover, under the defense theory, the relevant issue was not whether a warrant was actually required as a matter of law, but rather whether the police subjectively and in good faith believed that one was required. It was undisputed that the police were advised by the district attorney's office to obtain a warrant. Defense counsel did not seek to question the police about whether they personally believed a warrant to be necessary at the time, and the court did not preclude such questions.

The only question precluded by the court's ruling was the one calling for a legal conclusion: whether a warrant was actually necessary. Chambers and Miller were not restricted from asking the police about whether they believed the warrants to be necessary, and did in fact cross-examine at length about their delay in applying for a search warrant. Furthermore, Chambers and Miller effectively challenged the accuracy of the state's blood-alcohol level estimates through cross-examination of Dr. Propst, the state's expert. Under the circumstances, the trial court did not abuse its discretion in restricting cross-examination.

■ Chambers and Miller also contend that the trial court erred in allowing the jury to view twenty-seven color photographs of Valentine's autopsy. Dr. Propst, the pathologist, used the photographs, together with a marked dummy, to illustrate his testimony about the location of the

wounds, the direction of the cutting edge of the knives used to inflict the wounds, the force of the blows, and the likelihood that some of the wounds were defensive.

The standard for admission of illustrative evidence is well established:

[A] photograph is admissible in evidence in the discretion of the trial judge, as an aid to the court or jury, after it has been shown to be a faithful representation of whatever it purports to depict, provided it is relevant, and provided its evidentiary value is not outweighed by any prejudice it might create.

*Stevens v. State*, 443 P.2d 600, 603 (Alaska 1968); *Sheakley v. State*, 644 P.2d 864, 870 (Alaska App.1982).

The photographs in the present case, which depicted the depth, location, and direction of the victim's wounds, were relevant to determine whether Valentine had been stabbed by one or by two assailants. The state was not bound by the defendants' willingness to stipulate to what the photographs would depict. Nor were the photographs merely cumulative of Dr. Propst's testimony or of his demonstrations with the mannequin. The issue of whether Valentine was stabbed by one or two assailants was hotly contested in this case. The opportunity to view the actual photographs could well have been of material benefit to the jury in its evaluation of Dr. Propst's testimony on the issue. The mere fact that the photographs were unpleasant and potentially distressing does not in itself establish that they were unduly prejudicial. *See Valentine v. State*, 617 P.2d 751, 754 (Alaska 1980). This is particularly true in the present case, in which the jury had been thoroughly exposed to the gruesome details of the crime through other evidence.

The trial court did not abuse its discretion in admitting the challenged photographs.

■ Finally, Chambers and Miller appeal their sentences as excessive. Chambers received consecutive sentences totaling 126 years.[3] He argues that consecutive sentences were inappropriate. At the time he committed the offenses, Chambers was thirty-eight years old. He had an extensive felony record, including one robbery conviction (1982), one conviction for escape without force (1981), one burglary conviction (1969), and multiple convictions for grand theft and other property crimes. Chambers has abused alcohol and controlled substances since age twelve, and it appears that his criminal record is directly related to his substance abuse.

In imposing sentence, Judge Buckalew specifically found that Chambers was a dangerous offender who had no realistic prospects for rehabilitation and who needed to be isolated for the rest of his life in order to protect the public. This conclusion is amply supported by Chambers' extensive prior record and by the brutal and gratuitous nature of the offenses in this case. Under the circumstances, the sentencing court was not clearly mistaken in imposing consecutive terms totalling 126 years. *Nukapigak v. State*, 663 P.2d 943 (Alaska 1983).

■ Miller was sentenced a total of ninety-nine years to serve.[4] Miller argues that his ninety-nine year sentence, the maximum for first-degree murder, is excessive. He contends that a lesser sentence is justified by two factors: his status as a first felony offender with no prior criminal record, and the trial judge's finding that Miller followed, and was therefore less culpable than, his uncle, Chambers.

---

**3.** Chambers was sentenced to consecutive terms of three years for each of two counts of third-degree assault. He received fifteen years for three counts of first-degree robbery. These sentences were to be served concurrently with each other but consecutively to the sentences for assault. Chambers was also sentenced to six years for two counts of first-degree burglary. These terms were also to be served concurrently with each other but consecutively to the sentences for robbery and assault. Finally, Chambers received the maximum term of 99 years for first-

degree murder. The murder sentence was imposed consecutively to all of the other sentences.

**4.** Miller received ninety-nine years for his conviction of first-degree murder. He also received three years for each of three counts of burglary, and seven years for each of three counts of first-degree robbery. All of the sentences were concurrent.

Judge Buckalew found the murder in this case—the deliberate and unprovoked slaughter of an innocent stranger—among the worst in its class. While the judge believed that Miller might not have committed the murder on his own, he nevertheless concluded that Miller actively participated in the crime. Moreover, the murder was just one, albeit the most serious, in a series of violent crimes committed by Miller that evening. The crimes involved six different victims. Having independently reviewed the entire sentencing record, we conclude that the sentencing court was not clearly mistaken in imposing Miller's sentence. *See Lewis v. State*, 731 P.2d 68 (Alaska App.1987); *Riley v. State*, 720 P.2d 951 (Alaska App.1986).

The judgments of the superior court are AFFIRMED.