785 P.2d 224

**STATE of New Mexico, Plaintiff–Appellee,**

v.

**Toby SANCHEZ, Jr., Defendant–Appellant.**

No. 18057.

Supreme Court of New Mexico.

Nov. 2, 1989.

Rehearing Denied Dec. 5, 1989.

Jacquelyn Robins, Chief Public Defender, Susan Gibbs, Appellate Defender, Santa Fe, for defendant-appellant.

Bryan L. Hunt, Las Végas, trial counsel.

Hal Stratton, Atty. Gen., Margaret B. Alcock, Asst. Atty. Gen., Santa Fe, for plaintiff-appellee.

## OPINION

SOSA, Chief Justice.

Defendant-appellant, Toby Sanchez (Sanchez), appeals his conviction for first-degree murder. During the evening of May 26/27, 1987, in Watrous, Sanchez killed Robert Vigil by cutting Vigil's throat several times while he lay sleeping in a state of alcoholic intoxication. Sanchez and Vigil had been together at the home of another man, where several people had been drinking heavily. Sanchez was on probation for

the commission of burglary and larceny. As a condition of probation Sanchez was not permitted to drink alcoholic beverages, but he did so and progressively became intoxicated over the course of the evening. In addition, he took two prednisone pills to control his asthma. Witnesses testified that following the killing Sanchez seemed to be in a dazed state, showed no emotions, and appeared not to be shocked by Vigil's death. Sanchez asked one or more persons in the home to help him bury the victim's body, but no one agreed, and the victim was not buried. Sanchez then drove to Las Vegas and parked in front of a friend's house. The friend testified that Sanchez was crying and whimpering, and asked him to drive back to Watrous with Sanchez to determine if a killing had been committed.

At trial, Sanchez introduced the testimony of an expert medical witness, who testified that prednisone was known to produce a psychotic reaction in a small percentage of people, that the description of Sanchez' behavior at the time of the killing was consistent with such a reaction, and that, in his opinion, at the time of the killing Sanchez was unable to tell right from wrong because of his use of alcohol and drugs and was incapable of forming the deliberate intent to kill someone. The State did not rebut this testimony with contrary expert testimony but did present testimony from Sanchez' doctor, who stated that while he had read about the possibility of a psychotic reaction to prednisone, he personally had never seen such a case. He also acknowledged that it was unlikely he would have warned Sanchez about this possible side effect, even had he known about Sanchez' problems with alcohol. Sanchez' employer testified that he had found several vials of pills in areas of his house where Sanchez had been, and that a missing prescription of librium was found in a clothes hamper that could have been used by Sanchez. Sanchez' medical expert testified about a syndrome known as "librium rage" which could produce unexplained and unexpected violent behavior in someone who had ingested librium.

The State countered Sanchez' defense of incapacity to form specific intent by introducing testimony of Loretta Garcia (Garcia) and Gloria Jean Salas (Salas). Garcia testified that she had talked with Sanchez several hours before the killing. Sanchez said something about "killing time" or "killing him." During pre-trial investigation, Garcia had said that Sanchez, in speaking of "killing," had referred specifically to Vigil, but Garcia later denied this. Salas testified that following the killing, Garcia came to Salas' house to comfort Salas' daughter, who had been Vigil's girlfriend. During the conversation Garcia expressed misgivings over not warning someone about Sanchez' threat. Had she done so, Garcia said, Vigil now might not be dead.

On appeal, Sanchez raises the following arguments as to alleged prejudicial error:

## (I) NO SPEEDY TRIAL, IN VIOLATION OF SCRA 1986, 5-604

Sanchez argues that his trial took place more than six months after his arraignment, in violation of SCRA 1986, 5-604, which reads, in pertinent part, as follows:

B. * * * * The trial of a criminal case * * * shall be commenced six (6) months after whichever of the following events occurs latest:

     *     *     *     *     *     *

(7) the date the court allows the withdrawal of a plea or the rejection of a plea made pursuant to Paragraphs A to F of Rule 5-304.

C. * * * * The time for commencement of trial may be extended only by the supreme court, a justice thereof, or a judge designated by the supreme court, for good cause shown * * * * If the supreme court finds that there is good cause for the granting of an extension beyond the six (6) month period, it shall fix the time limit within which the defendant must be tried.

D. * * * * In event the trial of any person does not commence within the time specified in Paragraph B of this rule or within the period of any extension granted as provided in this rule, the information or indictment filed against

such person shall be dismissed with prejudice.

SCRA 1986, 5–604.

Sanchez was arraigned on July 8, 1987. The State properly received from the supreme court an extension of time to try Sanchez. The extension was to expire on February 5, 1988. In January, however, the State and Sanchez' counsel negotiated a plea of guilty to voluntary manslaughter. The State signed the agreement on February 10. Sanchez signed it on February 25, and his counsel signed it on February 26. A hearing to enter the plea was scheduled for March 15, 1988. From the record it appears that the State entered into plea negotiations based on prior approval of the plea bargain by the victim's family. On March 14, Sanchez' counsel learned that the victim's family publicly had expressed disapproval of the plea. On March 15, Sanchez' counsel filed a motion to dismiss the charges with prejudice because trial had not begun by February 5. On March 15, following testimony by the victim's family in opposition to the plea bargain, the trial court rejected the negotiated plea. Sanchez states that if the court had rejected the plea on February 5 at the latest, the time for commencement of trial would have been extended by six months to August 5. Trial actually began on September 6. Thus, Sanchez argues, trial began too late and the motion to dismiss should have been granted. The State contends that the pivotal date is March 15, arguing that the parties agreed that all proceedings were to be held in abeyance until a ruling by the court on the plea bargain. Thus, the State concludes, the State had until September 15 to start trial.

■ We agree with the State's position. It is true that the extension of time ended on February 5. Yet, twenty days after that date, on February 25, Sanchez signed a plea agreement. On the following day, February 26, his attorney signed the plea agreement, knowing that a hearing on the plea was scheduled for March 15. During the period between February 5 and March 15 it clearly was understood by the parties that the action against Sanchez was held in abeyance. By his and his attorney's actions, Sanchez expressed his implied consent to continue the date for trial past the February 5 deadline and to six months past March 15. While it is true that SCRA 1986, 5–604 does not speak to a situation in which the parties among themselves agree to have waived the strict provisions of the rule, prudence and common sense dictate here that the State was not required to obtain a second extension of time. The parties implicitly agreed to extend the February 5 deadline to March 15, thereby suspending the running of the six-month requirement of the rule until the period ending September 15. As trial actually commenced on September 6, Sanchez may not argue that he was not tried timely.

We acknowledge the latent ambiguity created by our use of the word "toll" in *State v. Flores,* 99 N.M. 44, 653 P.2d 875 (1982), as it applies to the six-month rule. "Toll" denotes "to bar, defeat, or take away," as in "to toll the statute of limitations," which denotes "to show facts which remove its bar of the action." *Black's Law Dictionary* 1334 (5th ed. 1979). Yet, "toll" may not have been the best word choice to use in this situation, because a statute of limitations may be tolled for a period of time, and then recommence in such a way that the remainder of the period remaining under the statute is extended by the period tolled. Thus, for example, a two-year statute of limitations tolled for three months is extended to two years and three months past the starting point of the statutory period.

Here, however, the six-month provision of the rule is not interrupted and then recommenced. Instead, the six-month period simply does not apply during a time in which one of the circumstances contemplated by the rule is in effect. When such a circumstance is no longer in effect, then a new six-month period in its entirety applies. Because of the ambiguity created by our earlier use of "toll," we refrained from using that word in our recent opinion of *State v. Mendoza,* 108 N.M. 446, 774 P.2d 440 (1989). Instead, we spoke of "suspen-

sion of the proceedings." *Id.* at 449, 774 P.2d at 443.

*Mendoza* is controlling here. In *Mendoza* the circumstance which suspended the operation of the rule was a mutually pursued mental exam to determine competency. In both cases our reasoning is the same. As in *Mendoza,* so, too, here, "the delay [was] clearly for the benefit of the defendant who cannot stand trial until the issue of [the plea bargain] has been properly assessed." *Id.* "During the time an accused's [plea bargain] is being assessed, he or she is unavailable for trial. Regardless of who initiates the proceeding a [pending plea bargain] is clearly on behalf of the accused and in no way infringes on that person's speedy trial rights." *Id.* "[Such a delay is] chargeable to the defendant and must be excluded from any speedy trial analysis. A common sense approach of [Rule 5–604(B)(7)] mandates this interpretation." *Id.*

### (II) PROSECUTORIAL MISCONDUCT

Sanchez argues that during trial the prosecution was guilty of misconduct sufficiently prejudicial to constitute reversible error. Sanchez alleges that, while no one incident of the alleged misconduct may have been sufficiently egregious to constitute reversible error, taken together, and in their cumulative effect, the prosecutor's actions consisted of fundamental error, even when there was no objection. The alleged misconduct includes: (a) giving the victim's parents copies of jury questionnaires completed by members of the venire; (b) referring to Sanchez in closing argument as not having been "insane" at the time of the crime, when Sanchez had never raised the insanity defense; (c) commenting several times on Sanchez' criminal record and his violation of probation for drinking alcoholic beverages; (d) stating that Garcia was upset and crying during testimony and that he (the prosecutor) had noted this fact for the record; (e) stating that he had an "important job to do" in prosecuting Sanchez on behalf of the State of New Mexico; (f) stating that Sanchez wanted the jury to "let him go," thereby suggesting to the jury that it should consider the effects of its verdict; (g) exacting from potential jurors a "promise" to convict Sanchez if they found him guilty beyond a reasonable doubt, and then reminding the jury of their promises during closing argument; (h) telling the jury, "I believe [the victim] and his family and every decent person in this state cries out to this jury, 'Let justice be done!' "; (i) improperly commenting on the law by stating to the jury that just because Sanchez introduced expert testimony the State was not required to introduce expert testimony; and, (j) improperly referring to facts outside the case by asking the expert witness about the John Hinckley case, thereby raising a comparison between Sanchez and a notorious criminal.

The State responds by saying (a) that Sanchez did not object at trial to the prosecutor's asking the jury to "promise" to return a guilty verdict upon presentation of proof beyond a reasonable doubt, and that the court did not abuse its discretion in allowing this question; (b) that the court instructed the jury as to a possible verdict of guilty but mentally ill, and that *Black's Law Dictionary* defines "insanity" as "more or less synonymous with mental illness or psychosis"; (c) that reference to John Hinckley occurred during cross-examination of the expert in the context of the following question: "[Are you] familiar with the John Hinckley case where you had these distinguished doctors coming up and reaching completely opposite conclusions?"; (d) that the comment about Sanchez wanting to be "let go" arose in the context of the following statement: "Now [Sanchez] wants to say, 'Let me go. I was out of it. My acts were not voluntary.' You can't believe this."; (e) that the comment about the State's not having to present expert testimony arose in the context of a response to the following argument by Sanchez' counsel: "No one contradicted anything he said. The State had the burden to prove, and yet, did anyone come here and say, 'I'm as qualified as he and he's wrong?' No." The State's argument in response was, "[B]ecause the defense chooses to bring an expert does not create an obligation on the State to bring one to

argue back."; (f) that as to the comments about Garcia, the prosecution's "important job," and the "decent person's cry for justice," the State argues that Sanchez' attorney did not object at trial to any of these statements; (g) as to comments on Sanchez's intoxication as a violation of parole and the related comments on Sanchez's prior convictions, the State argues that the jury was given an instruction on involuntary intoxication and that Sanchez' knowledge of the effect which alcohol would have on him was relevant and admissible, and that a discussion of Sanchez' other crimes on cross-examination was permissible to show Sanchez' knowledge of what he was doing.

Further, counsel for Sanchez did object at trial when the prosecutor attempted to question his client about whether Sanchez had been intoxicated when he committed the burglary for which he previously was convicted, and whether he had ever been in trouble with the law on other occasions when intoxicated. Although the court did not allow Sanchez to answer these questions, neither did it admonish the jury to disregard the questions. On appeal, Sanchez argues that the prosecutor's questions constituted misconduct and, absent a curing instruction by the court, are grounds for reversal. We disagree.

In retrospect, it may be argued that because the defendant did not request an instruction on involuntary *alcohol* intoxication, but only on involuntary intoxication resulting from his ingestion of prednisone, the question of his knowledge of the effects of alcohol consumption dealt with a false issue. *See* SCRA 1986, 11–404(B), 14–5106 (involuntary intoxication is a complete defense to both first and second degree murder). The jury also was instructed on the defense of inability to form a specific intent due to alcohol *or* drug consumption. These defenses do not require that the defendant be unaware of the effects of ingesting the intoxicant; however, they only would have precluded a verdict of guilty to first degree murder. *See* SCRA 1986, 14–5110.

Nevertheless, given the importance and complexity of the issues surrounding Sanchez' ingestion of alcohol and drugs in this case, and the fact that the defendant had testified on direct examination to the former convictions, we do not believe the prosecutor's decision to ask the alcohol-related question at that point in the trial amounted to misconduct. Moreover, even if we assumed the court's decision not to admonish the jury was error, it did not amount to prejudicial error.

We find no error in any of the prosecutor's remarks. With respect to the "jury promise" issue, we note that, while a party may not elicit a promise to return a *particular* verdict from the jury, a *conditional* question asking whether the jury would return a verdict in favor of the state, *if the state proves its case,* is permissible. Here, during voir dire, the prosecutor asked the jury:

> Can everyone here promise that if the state does its job correctly, that is, provides enough evidence to base a conviction beyond a reasonable doubt, that they will return a guilty verdict? Is there somebody here who can't do that? I need to know. Can everybody here make that promise?

We do not find this statement prejudicial. "The doctrine of fundamental error should be applied sparingly, to prevent a miscarriage of justice, and not to excuse the failure to make proper objections in the court below, *State v. Aull,* 78 N.M. 607, 435 P.2d 437 (1967), *cert. denied,* 391 U.S. 927, 88 S.Ct. 1829, 20 L.Ed.2d 668 (1968)," *State v. Clark,* 108 N.M. 288, 772 P.2d 322, *cert. denied,* —— U.S. ——, 110 S.Ct. 291, 107 L.Ed.2d 271 (1989), as was the case here, where no objections were made.

## (III) INSUFFICIENCY OF EVIDENCE TO PROVE INTENT TO MURDER

Sanchez argues that evidence of his blood alcohol content after arrest (.2%), the expert's testimony as to Sanchez' inability to distinguish right from wrong, the testimony of witnesses who stated that Sanchez appeared in a daze after the killing, the possibility that Sanchez also had taken dangerous medication, the dubious nature of

Garcia's testimony and the lack of a motive, all taken together, constitutes "overwhelming evidence of a lack of deliberate intent."

The State points to Salas' testimony that Garcia had told her that Sanchez had threatened to kill the victim, and not just "to kill" in the abstract, that another witness testified that Sanchez and the victim had argued on the evening of the killing, that following the killing Sanchez told another witness that he didn't care that he had killed the victim, that the victim's throat was cut not once, but several times, and that Sanchez was not so drunk that he could not drive an automobile to Las Vegas and safely park the automobile. The State argues that the existence or nonexistence of intent is a question for the jury, citing *State v. Sparks*, 102 N.M. 317, 694 P.2d 1382 (Ct.App.1985).

We agree with the State that there was sufficient evidence presented to permit the jury to find the requisite elements of first-degree murder, including specific intent. *Sparks* and *State v. Roybal*, 66 N.M. 416, 349 P.2d 332 (1960), are controlling. The jury found the requisite intent, and we will not disturb the jury's finding.

### (IV) STATE'S FAILURE TO MAKE TIMELY DISCLOSURE OF WITNESSES AND EXHIBITS

■ Sanchez argues that he was prejudiced by the State's revealing to his counsel only two weeks before trial that the State intended to call Garcia and Salas as witnesses, when the State knew about these witnesses well before the date on which their names were disclosed. Further, Sanchez alleges that it was error for the State not to disclose during discovery the existence of certain photographic exhibits and to reveal these to defense counsel only during the trial. The State argues that Sanchez does not show how he was prejudiced by the State's conduct with respect to discovery. The State contends that Sanchez had fifteen days before trial to interview the witnesses, who were local people and readily available, and that the photographs were cumulative evidence rather than material in that they were of the murder scene and were used to corroborate the testimony of some of the witnesses.

We agree that Sanchez was not prejudiced by the State's delay in making disclosure of witnesses and of the photographs. The court's opinion in *State v. Tomlinson*, 98 N.M. 337, 339, 648 P.2d 795, 797 (Ct. App.), *rev'd on other grounds*, 98 N.M. 213, 647 P.2d 415 (1982), accurately states the standard which is to be applied here.

### (V) ABUSE OF DISCRETION IN DENYING INDIVIDUAL VOIR DIRE OF VENIRE

■ During voir dire, Sanchez' counsel asked the court to permit him to ask potential jurors specific questions about their knowledge of the case and the families involved. This questioning was needed, it is alleged, because the victim's parents had been part of the venire and because the community from which potential jurors were drawn was small and the crime notorious. After a hearing in which the court ascertained from both attorneys that there had been no evidence of jury tampering, the court denied the defense motion for limited and individual voir dire. Sanchez alleges error because the victim's parents, excused from jury duty for cause, were permitted to stay in the courtroom during questioning, thus, it is contended, to influence the emotions of potential jurors and prevent them from giving impartial answers to general questions. Further, the victim's mother approached a potential juror in the hall of the courthouse and made a comment which the potential juror took to be an attempt at improper influence. The potential juror was excused for cause and the victim's parents were admonished not to speak to any other potential juror.

The State argues that the defense motion to examine potential jurors individually did not include a request that the victim's parents be removed from the venire. Further, after the victim's mother had approached the potential juror in the hall, the court convened the panel to ask if anyone on the panel had heard or discussed anything with anyone outside of the courtroom that

would affect his or her opinion of the case. No one on the panel said they had had such a communication. The court then allowed each attorney to follow up with questions, but neither did so. Defense counsel did not renew his motion for limited voir dire at this time or at trial.

Neither at trial nor on appeal does Sanchez show how he has been prejudiced by the court's conduct with respect to voir dire. *See State v. Segotta,* 100 N.M. 18, 23, 665 P.2d 280, 285 (Ct.App.1983) (record must affirmatively show that defendant was not tried by a fair and impartial jury); *State v. Coates,* 103 N.M. 353, 358, 707 P.2d 1163, 1168 (1985) (mere speculation on defendant's part that his right to an impartial jury was violated will not suffice to show that the trial court abused its discretion in not granting a mistrial). Here no affirmative showing has been made that Sanchez was not tried by a fair and impartial jury, and, far from moving for a mistrial, Sanchez' counsel at trial neither objected to the court's conduct nor availed himself of the opportunity to question the panel following the court's making it available for questioning.

For the foregoing reasons, we find that Sanchez suffered no error in his conviction. Accordingly, the judgment and sentence of the court is affirmed.

IT IS SO ORDERED.

MONTGOMERY, J., concurs.

RANSOM, J., specially concurs.

RANSOM, Justice (specially concurring).

I specially concur to emphasize that counsel for Sanchez reached a plea agreement with the prosecutor in January, *prior to the expiration of the extension.* The parties *understood* that the plea agreement would be reduced to writing and would be presented to the court on March 15, after the expiration of the extension.

Although the prosecution did not seek an additional extension, Rule 5-604 was not intended to require this Court to act each time delay is due to an express or implied stay for reasons directly related to the events specified in the Rule as triggering a recommencement. This reading of Rule 5-604 is consistent with the long standing position of this Court that the Rule should be given a common-sense interpretation to effect the prompt, orderly expedition of criminal trials and not to effect technical dismissals. *See State v. Mendoza,* 108 N.M. 446, 774 P.2d 440 (1989); *State v. Flores,* 99 N.M. 44, 653 P.2d 875 (1982); *State v. Benally,* 99 N.M. 415, 658 P.2d 1142 (Ct.App.1983).

It is in light of these principles that the six-month rule did not require dismissal of the charges in this case. Within a current six-month period, the parties at least impliedly agreed to stay proceedings pending the anticipated plea disposition, the rejection of which was an occurrence that operates to recommence the running of the six months under Rule 5-604. The Rule did not apply until the plea was rejected.