947 P.2d 502

STATE of New Mexico,
Plaintiff–Appellee,

v.

Wayne ESKRIDGE, Defendant–Appellant.

No. 17090.

Court of Appeals of New Mexico.

Sept. 15, 1997.

Tom Udall, Attorney General, Arthur W. Pepin, Assistant Attorney General, Santa Fe, for Plaintiff–Appellee.

Edmund J. Lang, Edmund J. Lang, P.A., Albuquerque, for Defendant–Appellant.

## OPINION

FLORES, Judge.

1. Defendant appeals from the trial court's denial of his motion to suppress evidence and his motion to dismiss for violation of his sixth amendment constitutional speedy trial rights and the six-month rule, Rule 5–604(B), NMRA 1997. We affirm.

## I. SIX–MONTH RULE AND CONSTITUTIONAL RIGHT TO SPEEDY TRIAL

2. Initially, we note that in this case the trial court failed to analyze for a violation of the six-month rule independent of its speedy trial constitutional analysis. A six-month rule issue is analytically separate from a constitutional speedy trial issue and the inquiry under each issue differs. *See State v. Manzanares*, 121 N.M. 798, 800, 918 P.2d 714, 716 (1996) (trial court weighs factually-based factors under constitutional analysis, while Supreme Court does not when resolving factual issues on Rule 5–604 motion for extension); *County of Los Alamos v. Beckman*, 120 N.M. 596, 600–01, 904 P.2d 45, 49–50 (Ct.App.1995) (noting "inherent differences between the inquiries required under the constitution and six-month rules to determine whether a violation has occurred," and that the two rules are "distinct in their operation and reach"). Because the trial court failed to consider Defendant's six-month rule argument independent of its analysis of his speedy trial rights, this Court was unable to determine from the trial court's original findings and conclusions whether Defendant's motion had merit. This Court therefore ordered a limited remand, instructing the trial court to enter specific findings and conclusions on the six-month rule and speedy trial issues. *See generally Manzanares*, 121 N.M. at 799–800, 918 P.2d at 715–16 (appropriate analysis is for the trial court to make separate determinations whether the delay violates the six-month rule and whether it violates the defendant's right to speedy trial); *State v. Mendoza*, 108 N.M. 446, 449, 774 P.2d 440, 443 (1989) (court first analyzed for violation of six-month rule and not finding one, went on to analyze for violation of speedy trial rights under the four *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972) factors). In this case, although, as discussed below, the new findings and conclusions are less than totally clear, we are able to determine that Defendant waived his rights under the six-month rule and suffered no violation of his constitutional speedy trial rights.

## A. Background Relevant to Six–Month Rule and Speedy Trial Analysis

3. In October 1993, Defendant was arrested and charged with possession of meth-amphetamine and drug paraphernalia. Defendant was indicted in December 1993, and on January 6, 1994, waived arraignment and entered a plea of not guilty. Defendant's case was originally set for trial on June 6, 1994. In April, Defendant moved to suppress certain evidence against him based on the alleged illegality of his warrantless stop and search, and requested a hearing on the motion. The trial court set the suppression hearing for April 27, but on April 25 the State moved to continue the suppression hearing. The suppression hearing was held on May 4, and after the hearing, the trial court issued a letter-ruling dated June 1 denying Defendant's motion to suppress. On June 2, the State moved for a continuance of the June 6 trial date on the basis that Defendant's counsel would be in federal court on that date.

4. After the trial court denied Defendant's suppression motion, Defendant and the State entered into plea negotiations. However, by July 6, the time Rule 5–604 is alleged to have run, the parties had not executed a signed plea. Further, the State had not petitioned our Supreme Court for an extension of time under Rule 5–604(C), and had not obtained any written agreement or waiver from Defendant of his rights under either the speedy trial provision of the constitution or the six-month rule.

5. The parties dispute the existence of an oral agreement, either to a plea or to a stay or waiver of Defendant's rights. Specifically, the State maintains that on June 21, the prosecutor and defense counsel reached an agreement whereby Defendant would plead guilty, have the underlying sentence suspended, and serve the mandatory one-year habitual offender penalty with one and one-half years probation. The State further contends that defense counsel affirmatively indicated that setting a plea hearing after the six-month rule expired was "no problem." Defendant maintains that he never agreed to waive or stay his six-month-rule rights, and that no firm plea agreement was reached

before July 6. Defense counsel also maintains that in his view, the case was still in negotiation until just before the September 29 plea hearing.

6. The record next reveals a notice of hearing dated July 13, scheduling a thirty minute "Disposition/Plea" hearing for July 25. Defendant moved to continue that hearing due to a schedule conflict, and the hearing was rescheduled for September 29. It was at the September 29 hearing that Defendant first asserted his six-month rule and speedy-trial rights. The trial court denied Defendant's motions in a December 27, 1994 letter-decision. Following denial of Defendant's interlocutory appeal on this issue, Defendant entered into a written conditional plea agreement whereby he agreed to plead guilty, with the underlying sentence suspended but to serve the mandatory one-year habitual offender sentence, conditioned on the State prevailing on this appeal.

### B. *Six–Month Rule Analysis*

7. Pursuant to Rule 5–604, Defendant's trial was to commence within six months of the waiver of his arraignment (January 6, 1994), Rule 5–604(B)(1), or "the date the court allows the withdrawal of a plea or the rejection of a plea made pursuant to Paragraphs A to F of rule 5–304." Rule 5–604(B)(7). Therefore, charges against Defendant were to be dismissed with prejudice, Rule 5–604(D), after July 6 unless, as the State argues, Rule 5–604(B)(7) is read to cover plea negotiations, by themselves, or unless alternatively, the parties in fact agreed to stay or waive the Rule in order to pursue a plea agreement.

#### 1. Plea Negotiations Alone Insufficient to Waive Six–Month Rule

8. The State argues that the six-month rule was not violated in this case because Rule 5–604(B)(7), which recommences the six-month rule on "the date the [trial] court allows the withdrawal of a plea or the rejection of a plea[,]" applies to "suspend" the six-month rule for unsuccessful plea negotiations themselves. The State further argues that this Court should be flexible in reading the six-month rule and that under *Mendoza*, 108

N.M. at 449, 774 P.2d at 443 (1989) and *State v. Sanchez*, 109 N.M. 313, 785 P.2d 224 (1989), this provision should be read to suspend operation of the Rule for the plea negotiations in this case. The State points out that in *Sanchez*, like this case, no written agreement was signed by the date the Rule was to have expired, yet the *Sanchez* court read Rule 5–604(B)(7) to include the time required for the trial court to assess the plea after the parties had agreed to a plea. *Sanchez*, 109 N.M. at 316–17, 785 P.2d at 227–28. Defendant counters that because in this case no signed plea agreement ever resulted, the "plain meaning" of the condition in Rule 5–604(B)(7) does not apply and therefore the six-month period expired July 6.

9. We agree with Defendant that Rule 5–604(B)(7) does not extend to plea negotiations, as such. In *Sanchez* it was undisputed that the parties had reached a plea agreement *before* the Rule ran. 109 N.M. at 316, 785 P.2d at 227 (parties negotiated a plea in January, and rule extension expired February 5). The parties in *Sanchez* also clearly understood "that the action against [defendant] was held in abeyance" pending assessment of the plea. *Id.* As we read *Sanchez*, it stands for the proposition that if a plea agreement is reached before the six-month-period expires, then the six-month-period begins anew if the agreement is later rejected by the Court. *See id.* at 316–17, 785 P.2d at 227–28. Therefore we do not read Rule 5–604(B)(7) to apply to plea negotiations, by themselves.

#### 2. Oral Agreement or Waiver Sufficient

10. We do not, on the other hand, find the existence of an ultimate written and signed plea agreement to be essential, as Defendant argues. Although it is true that in *Sanchez* a signed writing was executed *after* the Rule had run, the *Sanchez* reasoning did not focus on the existence of a signed written plea, but instead hinged on the undisputed existence of an *oral agreement* reached before the Rule expired. Other New Mexico cases help to illustrate the type of agreement or mutual understanding that will bring a case within the exceptions in Rule 5–604(B) and restart the six-month period. In *Mendo-*

za, both parties agreed, prior to the expiration of the rule, to determine the defendant's competency to stand trial, and in the interim the trial court suspended proceedings. 108 N.M. at 449, 774 P.2d at 443 (holding that "[t]he concurrence or stipulation of both the State and respondent to a suspension of the proceedings to determine competency is sufficiently analogous to the incompetency provisions of Rule 5–604(B)(2) to warrant automatic recommencement upon a subsequent determination of competency"). In *State v. Hastings,* 116 N.M. 344, 862 P.2d 452 (Ct. App.1993), the defendant agreed to waive his six-month rule rights in order to participate in a pre-prosecution diversion program, and this Court applied *Mendoza's* interpretation of the competency provision of the six-month rule, Rule 5–604(B)(2), to the pre-prosecution diversion program provision, Rule 5–604(B)(6). *See also State v. Coburn,* 120 N.M. 214, 217, 900 P.2d 963, 966 (Ct.App. 1995) ("[R]eview of these cases [including *Sanchez* and *Mendoza*] shows that a literal application of SCRA 5–604(B) will be set aside only when there is an event extending pretrial activity to the mutual benefit of the parties[.]"). In these cases the State either obtained an agreement or waiver from the defendant or there was an understanding between the parties that the defendant would not assert a six-month rule claim while the parties pursued the event in question. Under the *Sanchez* line of cases, then, the appropriate inquiry is whether, before the Rule expired, an oral or written agreement was reached or there was a clear understanding that the action against Defendant was being held in abeyance.

### 3. Trial Court's Findings on Remand Indicate Waiver

■ 11. Prior to the limited remand, this Court was unable to determine from the trial court's factual findings whether or not an agreement of the type contemplated by *San-*

chez, *Mendoza,* and *Hastings* existed in this case. In its original findings, the trial court noted that the existence of an agreement was disputed, and further noted that the State's subjective belief was that an agreement was reached by telephone on June 21, 1994, while the defense attorney's subjective belief was that no firm agreement had ever been reached. The trial court stated that the prosecutor's file supported the State's position, while a draft of an erroneous plea agreement dated June 15 and another draft dated September 26 supported Defendant's assertion that plea negotiations were ongoing. Significantly, the trial court did *not* resolve the factual dispute by finding that the State's version of facts (agreement by phone on June 21) had merit and Defendant's version (no firm agreement) did not. Instead, the trial court apparently followed the legal test from *State v. Lujan,* 112 N.M. 346, 815 P.2d 642 (Ct.App.1991), attributing fault for delay among the parties, which is appropriate only under a constitutional speedy trial analysis. *Compare id.* at 350, 815 P.2d at 646 (in constitutional speedy trial analysis, "the extent to which attempted plea negotiations constitute a valid reason for delay or should be charged against the state, defendant or both parties involves a factual issue to be determined by the trial court under the facts and circumstances of each particular case") *with Beckman,* 120 N.M. at 601, 904 P.2d at 50 (six-month rule analysis turns on "specific procedural events and dates" that amount to "triggering event[s]" and "formulaic procedural occurrences"). This Court therefore ordered a limited remand, instructing the trial court to make specific findings and conclusions consistent with a separate and appropriate analysis of Defendant's six-month rule claim.

■ 12. Although the trial court's new findings and conclusions after limited remand remain less than totally clear,[1] they do show

---

**1.** After remand, the trial court entered a new set of findings and conclusions that included the following:

    11. In their June 21, 1994, telephonic discussion, Defendant's attorney *orally agreed* to a plea bargain comprising of Defendant serving the one (1) year habitual offender enhancement, to be followed by one and

one-half (1½) year [sic] of supervised probation, probation transferrable to Albuquerque, New Mexico.

    12. Based on the telephonic negotiated plea and requested disposition date the State drafted a guilty plea agreement and sent it to the Defendant and set a plea and disposition hearing for July 25, 1994, a

that the trial court found both that Defendant's attorney orally agreed to a plea on June 21, and that his attorney affirmatively represented to the State that setting the plea hearing after the Rule expired was "no problem." These findings are sufficient to show that the parties in fact orally "agreed" to a plea, and that Defendant waived the Rule. In reaching this determination, we disregard Conclusion 1 as an error of law, given findings 11 and 12, and conclude that findings 9 and 13 are not necessarily mutually exclusive with findings 11 and 12, on which we rely.

### C. Constitutional Speedy Trial Analysis

▪ 13. In order to determine whether the delay before trial in this case violated Defendant's constitutional right to a speedy trial, this Court must "independently engage in the complex and sensitive process of balancing" four factors: (1) the length of the delay, (2) the reason for the delay, (3) the defendant's assertion of the right, and (4) the prejudice to the defendant. *Lujan*, 112 N.M. at 348, 815 P.2d at 644 (citing *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101).

▪ 14. We agree with the trial court that the twelve-month delay in this case was presumptively prejudicial—Defendant was arrested on October 5, 1993, and moved to dismiss the charges based on a violation of his right to a speedy trial on September 29, 1994. *Cf. Salandre v. State*, 111 N.M. 422, 428–29, 806 P.2d 562, 568–69 (1991) (nine-month delay presumptively prejudicial, in cases with simple charges and readily available evidence). We therefore proceed to review the remaining three factors.

▪ 15. There were various reasons for the repeated delay of Defendant's trial in this case. When assessing the "reason for delay"

factor of a speedy trial claim, the court must attribute the blame for the delay among the parties, unlike the analysis of Defendant's right to a trial within six months under the Supreme Court Rule. *See Lujan*, 112 N.M. at 350, 815 P.2d at 646 (examining the evidence to determine whether there were valid reasons for delay). The first trial setting of June 6 was continued by a June 2 request by the State, but on behalf of Defendant's attorney. The plea negotiations are themselves not a factor to be held against either party. *See id.* at 349–50, 815 P.2d at 645–46. The trial court found that the State drafted and forwarded a mistaken plea agreement to Defendant on June 15, making some of the delay attributable to the State. The trial court also found that Defendant's attorney agreed to a plea on June 21, and agreed that a later trial setting was "not a problem." This time is attributable to Defendant. Finally, the July 25 plea and disposition hearing was continued at the request of Defendant's attorney. Therefore we agree with the trial court that on balance, the "reason for delay" factor weighs against Defendant. Regarding the next factor, Defendant first asserted his speedy trial right on September 29, 1994, almost four months after the initial trial setting. We also agree with the trial court that this factor weighs against Defendant. Finally, the trial court rejected Defendant's proposed findings of fact relating to prejudice he had suffered as a result of the delay. While it is reasonable to conclude that the wait for resolution of his case caused Defendant anxiety and concern, there was no pretrial incarceration in this case and the trial court did not find that Defendant's defense had been in any way compromised. Therefore, this factor does not weigh against either party.

---

date after the six (6) month time limit (July 6, 1994) *on the assurances of defense counsel that the time would be no problem.*
(Emphasis added.)
However, the trial court also made the following findings:
    9. Throughout the time period from denial of the suppression motion to September 29, 1994 discussions on plea negotiations took place.

. . . .
    13. At the hearing on October 25, 1994, counsel for the Defendant could not remember approving the plea setting after July 6, 1994.
Finally, the trial court reached an apparently contradictory conclusion of law:
    1. The Defendant did not waive his right to trial within six (6) months.

16. On balance, we agree with the trial court that there was no violation of Defendant's constitutional right to a speedy trial.

## II. STOP, SEARCH, AND SEIZURE

### A. Stop of Defendant's Vehicle Based on Reasonable Suspicion

#### 1. Factual Background

17. The testimony developed at Defendant's suppression hearing revealed that in October 1993, a person previously unknown to the Clovis Police Department walked into the district attorney's office and presented himself to Investigator Jim Skinner. The informant stated he had been at the home of a person named Joe McDonald within the past hour and that he had seen McDonald and another person with a plastic bag containing "crank," which he explained was methamphetamine. The informant reported that McDonald and the other man, whose appearance and attire he described, were planning to go around town "delivering." The informant described the other man's vehicle and provided its license plate number. Skinner then took the informant with him in an unmarked car to the residence and confirmed the house and the car identified by the informant. Skinner contacted Officer Reeves and instructed him to set up surveillance of the house, and returned to the district attorney's office and began to prepare an affidavit for a search warrant. Skinner was aware, although indirectly, that a person named Joe McDonald was involved in trafficking of methamphetamine in the area. While on surveillance, Officer Reeves investigated who paid utilities at the address, and discovered they were registered to Joe McDonald, whom Reeves described as a "known convicted drug trafficker and user." During his surveillance, Reeves observed one person, whom he recognized as a suspected drug trafficker, come and go from the residence. A short time later, Reeves reported that the subjects were "on the move," and Skinner abandoned preparation of the search warrant because "there wasn't enough time" and instructed Reeves to "contact a marked unit and have the vehicle stopped." Defendant and McDonald left the residence in Defendant's car, stopped briefly at a grocery store, and were back in the car when they were stopped by Officer Hatcher. Defendant consented to a search of his car, but later resisted the officer's attempt to frisk him for weapons, and pulled a syringe needle from his pocket. Defendant was then forcibly searched, and the officer removed a bag containing methamphetamine from his waistband.

#### 2. Discussion

18. Defendant argues that the evidence against him was obtained in violation of the Fourth Amendment to the United States Constitution and Article II, Section 10 of the New Mexico Constitution and should therefore have been suppressed. See State v. Gutierrez, 116 N.M. 431, 445, 863 P.2d 1052, 1066 (1993) (rationale of New Mexico exclusionary rule). Defendant challenges both the basis for the stop of his vehicle and the subsequent pat-down search.

19. In this case, the informant's tip combined with the officers' investigation and independent knowledge gave rise to reasonable suspicion to stop Defendant's vehicle, although, as the State admits, not probable cause. In this regard, Defendant correctly points out that the trial court erred by testing the reliability of the tip under the "totality of the circumstances" test from Illinois v. Gates, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), instead of the two-prong Aguilar–Spinelli test adopted by our Supreme Court in State v. Cordova, 109 N.M. 211, 784 P.2d 30 (1989). Our Supreme Court in Cordova retained a two-prong test first articulated (and later abandoned) by the United States Supreme Court to ensure the trustworthiness of an informant's tip before that tip can be used as probable cause in support of a search warrant. Cordova, 109 N.M. at 212, 784 P.2d at 31 (adopting as test under New Mexico's Constitution the test from Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964) and Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), both overruled as they relate to the federal constitution by Gates, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527). Our Supreme Court in Cordova held that the allegations of an informant alone cannot pro-

vide probable cause to issue a search warrant unless officers can show both (1) the reliability of the information and (2) credibility of the informant (referred to as the two prongs of the *Aguilar–Spinelli* test). *Cordova,* 109 N.M. at 213, 784 P.2d at 32.

20. Although Defendant is correct that the *Gates* test does not apply under New Mexico law, and that on these facts it is not clear that the State could meet the *Cordova/Aguilar–Spinelli* test for probable cause, the pertinent initial question presented in this case is whether sufficient evidence supports reasonable suspicion for an investigatory stop, a question controlled by the reasonable suspicion inquiry in *State v. Bedolla,* 111 N.M. 448, 450–51, 806 P.2d 588, 590–91 (Ct. App.1991) and *State v. Flores,* 122 N.M. 84, 87–88, 920 P.2d 1038, 1041–42 (Ct.App.1996). This Court in *Bedolla* held that there was insufficient corroboration of the anonymous tip implicating the defendant, and insufficient follow-up investigation on the part of the police officers, to create reasonable suspicion for an investigatory stop. *Bedolla,* 111 N.M. at 451, 806 P.2d at 591. The *Bedolla* Court admonished that "[T]he limited information contained in the tip was substituted for investigative work" on the part of the officers, and referred to the *Cordova/Aguilar–Spinelli* test in support of its conclusion that police must investigate and corroborate anonymous tips with something more than innocent information available to the general public. 111 N.M. at 451, 806 P.2d at 591. Similarly, this Court in *Flores* held that an anonymous tip may justify an investigatory stop if innocent details in the tip are sufficiently corroborated by subsequent investigation to establish the tip's reliability. *Flores,* 122 N.M. at 88, 920 P.2d at 1042 (citing *Alabama v. White,* 496 U.S. 325, 332, 110 S.Ct. 2412, 2417, 110 L.Ed.2d 301 (1990)).

21. In this case, the trial court relied on the corroboration of innocent details, together with the fact that the informant made himself known to police, and the officer's independent knowledge that Defendant's consort was known to have dealt drugs in the past. More importantly, in this case the officers obtained further corroboration by further investigating. First, Skinner physi-

cally took the informant to the location and confirmed the car and house to which he had referred. Then Skinner asked Officer Reeves to begin surveillance, which resulted in Reeves observing another suspected drug dealer in the area pay a short visit to the house. The totality of this information supplied reasonable suspicion to stop Defendant, in contrast to *Bedolla,* where only innocent details available to the general public had corroborated the tip. Therefore in this case, although the trial court's reference to *Gates* was incorrect, *see Cordova,* 109 N.M. at 212, 784 P.2d at 31 (New Mexico Supreme Court does not consider principles in *Gates* controlling to state constitutional analysis), there was sufficient evidence supporting the trial court's conclusion that the stop was reasonable under *Bedolla* and *Flores.*

B. *Protective Frisk Reasonable*

1. Factual Background

22. Defendant next argues that even if the stop of his car was reasonable, the patdown search was beyond the scope of the officers' authority, and the officer's removal of a soft plastic bag from his waistband was an unconstitutional seizure. The State developed the following facts at the suppression hearing. After Officer Hatcher stopped Defendant's car, Officers Skinner and Reeves each arrived almost immediately. Skinner identified himself to Defendant, told Defendant he was suspected of peddling methamphetamine, and asked for consent to search his car. Defendant consented, and Officer Hatcher began to search the car while Officers Reeves and Skinner turned their attention back to Defendant. Both Reeves and Skinner testified that the vehicle was being searched while they dealt with Defendant. When asked when the search of the vehicle ended, Reeves replied that he believed Hatcher was "still checking the vehicle up until the time right before we left[.]" Skinner testified that the search of the car ended only "after all that what I just described [the arrest of Defendant] took place." No drugs were found in the vehicle.

23. After the search of the car commenced, Skinner noticed several things about Defendant's demeanor and appearance that

he said concerned him. Skinner described how Defendant was sweating, despite the fact that it was October and he was wearing only a tank top. He noted that Defendant was shifting his weight, darting his eyes, and "appeared ... to be extremely paranoid." Skinner further testified that, in his training and experience, these were actions consistent with use of methamphetamine. Upon further questioning, Skinner articulated that Defendant's physical appearance and conduct made him feel Defendant was on methamphetamine, and he knew from his training and experience that people on methamphetamine are less rational and harder to deal with, and that people who deal in methamphetamine are often armed. It was based on these observations, Skinner testified, that he told Defendant " 'What I need to do is ... to pat you down for weapons.' "

### 2. Discussion

24. Initially we note that while this investigatory stop based on a tip was reasonable, the scope of the intrusion allowed under such a stop is very limited. An officer is privileged, however, to check for weapons during an investigatory stop when the officer reasonably believes the defendant may be armed and dangerous, in order to ensure the personal safety of the officers. *Terry v. Ohio*, 392 U.S. 1, 24, 88 S.Ct. 1868, 1881, 20 L.Ed.2d 889 (1968).

25. We conclude that the officers' articulated concerns for their safety were sufficient to justify their attempt to frisk Defendant for weapons. Officer Skinner testified as to specific actions and conduct by Defendant that led him to conclude Defendant was under the influence of methamphetamines, and that in his experience and training the influence of methamphetamines heightens the danger to officers. Further, the officers acted on their safety concerns within the time frame before their reasonable suspicion expired. *See Flores*, 122 N.M. at 90, 920 P.2d at 1044 (if check on gun had been run during the scope of the valid investigatory stop, it would have been valid; because of time delay, it was not).

26. Here, the officers' concerns were reasonable, given our case law to the effect that the nature of the crime of drug-dealing can in itself justify a pat-down search for weapons. *See State v. Cobbs*, 103 N.M. 623, 630, 711 P.2d 900, 907 (Ct.App.1985) (Officer has privilege to frisk whenever " 'the suspect has been stopped upon the suspicion that he has committed, was committing, or was about to commit a type of crime for which the offender would likely be armed[.]' "). The types of inherently dangerous crimes invoking an officer's privilege to frisk includes "dealing in large narcotics transactions[,]" but not "possession of small amounts of marijuana[.]" *Id.* Therefore, because the officers here had reasonable suspicion of a possible large drug transaction, the officers were privileged to frisk for weapons in the time surrounding the initial stop, based on their articulated concern for safety.

### C. *Reasonable Suspicion Ripens into Probable Cause*

27. Officer Skinner's reasonable attempt to frisk Defendant transformed into a full-blown seizure and warrantless search of Defendant. Skinner testified that as he moved toward Defendant, telling him that he was about to be patted down for weapons, Defendant reacted by becoming "very animated with his hands" and saying " 'You're not touching me.' " Skinner told Defendant to relax and repeated that he was going to pat him down for weapons. Defendant then stated " 'I got a needle in my pocket[,]' " and pulled the needle out. Skinner noticed that "the very end of the needle—had a small amount of liquid in [it]." Skinner grabbed Defendant's arm, seized the needle, and threw it on the hood of the car. Defendant then grasped Skinner's wrist, and at that point Skinner and Reeves physically struggled with Defendant. During the struggle, Skinner felt a bag in Defendant's waistband or pocket. Skinner testified that at the point Defendant produced the needle, he believed he had probable cause to arrest Defendant for drugs, and proceeded with the search of Defendant's person based on both that belief and his continued concern that Defendant might be armed. Skinner indicated that the bag, which was ultimately found to contain methamphetamine, did not feel like a weapon

when he removed it, but testified that he was concerned that it might contain another needle and had concerns about contracting AIDS. Skinner then placed Defendant under arrest.

 28. Defendant's responsive actions to the officer's lawful attempt to execute a protective frisk provided both the probable cause and exigent circumstances to justify a warrantless search of Defendant. *See Campos v. State,* 117 N.M. 155, 159, 870 P.2d 117, 121 (1994) (warrantless arrest in New Mexico requires probable cause and exigent circumstances). The fact that Defendant produced a syringe needle, combined with the information from the tip and the officers' investigation, amounted to probable cause to believe Defendant was involved in unlawful activity. Further, the testimony that Defendant wielded a syringe needle was sufficient to support the conclusion that an "emergency situation" justified the warrantless seizure of Defendant. *See State v. Copeland,* 105 N.M. 27, 31, 727 P.2d 1342, 1346 (Ct.App.1986) ("Exigent circumstances means an emergency situation requiring swift action to prevent imminent danger to life or serious damage to property, or to forestall the imminent escape of a suspect or destruction of evidence."). Therefore the reactions of Defendant to Officer Skinner's attempt to execute a valid protective frisk provided both probable cause and exigent circumstances that transformed the investigative stop into a valid warrantless search and arrest.

## III. *CONCLUSION*

29. We hold that under Rule 5–604(B)(7), bare plea negotiations themselves do not restart the six-month clock. Because in this case the trial court's findings on limited remand support the existence of an oral agreement to waive the six-month rule, we affirm the trial court's decision that Defendant's case should not be dismissed under Rule 5–604(D). We further determine that substantial evidence supports the trial court's conclusion that Defendant's constitutional speedy trial rights were not violated. Lastly, we hold that both the investigatory stop of Defendant's car and the accompanying protective frisk were reasonable, and that the officer's reasonable suspicion ripened into probable cause and exigent circumstances that justified the warrantless seizure of the methamphetamine from Defendant's waistband. Therefore, we affirm.

30. **IT IS SO ORDERED.**

HARTZ, C.J., and BUSTAMANTE, J., concur.